RATTET, PASTERNAK & GORDON-OLIVER, LLP
Attorneys for the Debtor
550 Mamaroneck Avenue, Suite 510
Harrison, New York 10528
(914) 381-7400
Jonathan S. Pasternak
Julie A. Cvek

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
In re:

APF GROUP, INC.,                               Chapter 11
d/b/a A.P.F. MASTER FRAMEMAKERS,      Case No. 09 B 23696 (RDD)
a/k/a APF MUNN,

                        Debtor.

----------------------------------------------------------------X

**DEBTOR'S MOTION SEEKING ENTRY OF: (I) SALE PROCEDURES ORDER (A) APPROVING BIDDING PROCEDURES, (B) APPROVING STALKING HORSE PROTECTIONS, (C) APPROVING THE FORM AND MANNER OF NOTICE, AND (D) SCHEDULING AN AUCTION AND SALE HEARING; AND (II) SALE APPROVAL ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS INTERESTS AND ENCUMBRANCES, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND LEASES IN CONNECTION THEREWITH,  (C) GRANTING THE SUCCESSFUL BIDDER GOOD FAITH STATUS, (D) WAIVING THE FOURTEEN (14) DAY STAY OF SALE ORDER, AND (E) GRANTING RELATED RELIEF**

**TO:    THE HONORABLE ROBERT D. DRAIN,
        UNITED STATES BANKRUPTCY JUDGE:**

      APF Group, Inc. d/b/a A.P.F. Master Framemakers, a/k/a APF Munn, the above captioned

debtor and debtor-in-possession (the "Debtor"), by its attorneys, Rattet, Pasternak & Gordon-Oliver,

LLP,  hereby files this motion ("Motion") pursuant to §§105(a), 363(b), (f) and (m), 365, 503, 507,

1146(a) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"),

Rules 2002(a)(2), 6004(a), (b), (c), (e), (f) and (g), 6006(a) and 9c), 9007 and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of two Orders, as follows:

- **Sale Procedures Order**: (i) establishing bidding procedures to govern the sale

(the "Sale") of substantially all of the Debtor's assets (the "Purchased Assets" or "Assets"), as

further defined in the Asset Purchase Agreement (the "APA"), between the Debtor and APF

Management Company, LLC, or its assignee or designee (the "Purchaser") , subject to higher

and better bids; (ii) approving Stalking Horse Protections; (iii) scheduling an auction to sell the

Assets (the "Auction"); (iv) scheduling a hearing to approve the Sale of the Assets in accordance

with the Auction (the "Sale Hearing"); and (v) approving the form and manner of notice of the

Sale, the Bidding Procedures, the Auction and the Sale Hearing.

- **Sale Approval Order**: (i) approving the Sale of the Purchased Assets in

accordance with the results of the Auction to the highest bidder (the "Successful Bidder"); (ii)

authorizing the assumption and assignment of certain executory contracts and leases in

connection with the Sale; (iii) granting the Successful Bidder good faith status; and (iv) waiving

the fourteen (14) day stay of the Order.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and

1334. Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      This proceeding has been initiated pursuant to Bankruptcy Code §§ 105(a),

363(b), (f) and (m), 365, 503, 507, 1146(a), Bankruptcy Rules 2002(a)(2), 6004(a), (b), (c), (e), (f)

and (g), 6006(a) and 9c), 9007 and 9014, and Local Rules 2014-1, 6004-1 and 6006-1.

## BACKGROUND

4.      On September 11, 2009, (the "Filing Date"), the Debtor filed a voluntary petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").

5.      Thereafter the Debtor's proceeding was referred to this Court for administration under the Bankruptcy Code.

6.      The Debtor has continued as a Debtor-in-Possession pursuant to §1107 and 1108 of the Bankruptcy Code.

7.      On October 2, 2009, an Official Committee of Unsecured Creditors was appointed (the "Committee") and is represented by the law firm of Platzer, Swergold, Karlin, Levine, Goldberg & Jaslow, LLP.  Neither a trustee, nor an examiner have been appointed.

8.      The Debtor was formed over 50 years ago as a craft shop to fabricate unique and distinctive picture frames and mirror frames. Many of the frames produced by the Debtor are reproductions of the finest antiques in museum collections. The Debtor's customers include the Metropolitan Museum of Art, Museum of Modern Art, The Smithsonian Institute, The White House Collection and many other fine public and private collections.

9.      The Debtor operates from its leased main office and warehouse located at 60 Fullerton Avenue, Yonkers, New York, as well as two additional leased showrooms located 215 East 59th Street, New York, New York and 79 East Putnam Avenue, Greenwich, Connecticut.

10.     The Debtor's chapter 11 bankruptcy filing was precipitated by two factors. After several years of increasing sales and revenues, in April 2007 the Debtor relocated its warehouse. The moving costs, which were taken directly from the Debtor's cash flow, exceeded the Debtor's anticipated costs of moving. As a result the Debtor obtained additional operating capital in hopes to "jump start" its business operations. However, the excessive moving costs and the disruption to

the Debtor's business operations, compounded by a severe drop in sales due to the economic recession, caused the Debtor to have significant cash flow constraints, prompting the chapter 11 Bankruptcy filing.

11.     From the outset of the Debtor's chapter 11 filing, the Debtor endeavored to expedite its exit strategy from the Chapter 11 proceeding.  The Debtor had immediate discussions with its Secured Creditors regarding the terms of a consensual plan of reorganization. The Debtor prepared detailed projections and other various financials, including cash flow statements, balance sheets, profit and loss statements. These financials were reviewed in depth by the Secured Creditors to investigate and make a determination about the viability of the Debtor's operations and the feasibility of a reorganization effort. Additionally, the Debtor engaged in efforts to obtain exit financing, including investigating the possibility of an equity infusion.

12.     Starting in January 2010, the Debtor engaged in serious negotiations with various lenders, investors and other interested parties to fund a chapter 11 plan of reorganization, and after six (6) months the Debtor filed its Chapter 11 Plan and Disclosure Statement in support of same. The Chapter 11 Plan filed by the Debtor on June 3, 2010 was contingent upon the $1.2 million infusion by APF Frame Holdings, LLC, an entity formed by Palm Ventures, LLC, as the co-Plan Funder, along with Molly Munn, daughter of Max Munn, the Debtor's principal. On August 24, 2010 the Bankruptcy Court entered an Order approving the Debtor's Third Amended Disclosure Statement. Thereafter, the Debtor engaged in the plan solicitation process and on September 1, 2010, the Debtor circulated the Debtor's Third Amended Disclosure Statement and Third Amended Plan of Reorganization.

13.     The Debtor's Third Amended Plan of Reorganization sought to significantly restructure the secured debt and equity in the Debtor post-confirmation and thus generated

substantial objections by the Debtor's mezzanine lenders, Advantage Capital New York Partners I, L.P., Advantage Capital New York Partners II, L.P., Alliance Mezzanine Investors, L.P., Rand Capital SPIC LP (collectively, "Alliance"). Specifically, in the Third Amended Plan of Reorganization, Alliance's claims were to be wholly treated as nonpriority unsecured claims based upon the liquidation value of the Debtor. The thrust of Alliance's objections to the Third Amended Plan was as to valuation of the Debtor's estate, and thus the treatment of Alliance's claims, coupled with the extinguishment of all of the equity interests in the Debtor (in which Alliance had an equity interest).

14.     Concerned with preserving the Debtor's estate and Plan Funding, the Court directed expedited discovery between the Debtor and Alliance on the issue of valuation and subsequently held an evidentiary hearing on this issue.

15.     Notwithstanding the efforts to expedite the confirmation of the Third Amended Plan, in November 2010, the Plan Funder ultimately exercised its "due diligence out clause" under the Plan Funding Agreement,  thereby rescinding its funding of the Debtor's Third Amended Plan, making the Debtor's reorganization possibilities diminished, if not severely impaired.

16.     At that juncture, the Debtor determined that it was not able to promote another confirmable plan of reorganization. Given the Debtor's continued operating losses and accrual of significant post petition administrative liabilities to its union, taxing authorities and the Chapter 11 professionals in the aggregate approximate amount, as of  December 31, 2010, of $1,000,000, the Debtor, using its best business judgment, determined that in order to maximize the value of the Debtor's assets and to preserve the jobs of its 100 employees it needed to explore the option of a pre-confirmation asset sale, as opposed to converting this proceeding to a chapter 7 case for

a liquidation which would necessitate the Debtor to "going dark" and the termination of its employees.

17.     The Debtor determined that the best way to avoid an imminent cessation of business operations, maximize the value of its assets for creditors, and to try and save approximately 100 local jobs, was to seek an immediate sale of substantially all of its assets.

18.     The Debtor's decision in conducting a pre-confirmation asset sale under §363 of the Bankruptcy Code, as opposed to approving a sale of its assets through a chapter 11 process, was based upon the Debtor's imminent inability to sustain operations. Since the chapter 11 filing, the Debtor sustained a net operating loss of $689,183.42 through October 31, 2010, and sustained even further significant losses through December 31, 2010. The Debtor cash flow position is now compromised and the Debtor can no longer continue its operations.

19.     Moreover, several of the customers that the Debtor conducted business with prior to the Bankruptcy filing have ceased placing orders with the Debtor until the Debtor emerges from Bankruptcy. Thus, it is imperative to preserve the good will and going concern of the Debtor in order to maximize the sale of the Debtor's assets for the benefit of the Debtor's estate and creditors.

20.     Thus, the Debtor began exploring the possibility of a sale of its Assets with several parties that had expressed an interest in the Debtor's Assets during the plan solicitation process, including:

- Palm Ventures, LLC;
- Bruce Berger, a Connecticut based business turnaround specialist;
- Milton Bleier Framing, a Long Island, NY based framing company referred by the Committee;
- a venture capitalist based in Massachusetts referred by the Committee;
- a competitor AMCI, Inc. located in New York, NY;  and
- Courier Capital based in Buffalo, NY.

21.     Over the past month, the Debtor has also been negotiating a sale of its assets with

APF Management Company, LLC, an entity to be formed by the principals of Hampshire

Management Company, LLC, the Debtor's landlord for its Yonkers, NY warehouse.

**The Asset Purchase Agreement**

22.     On or about January 13, 2011, after arms-length negotiations, the Debtor and the

Purchaser  executed an Asset Purchase Agreement (the "APA"), a copy of which is attached

hereto as **Exhibit A.**[1] Subject to this Court's approval of higher and/or better offers through an

auction process, the Debtor seeks approval to sell its Assets to the Purchaser on the following

terms and conditions:

| Seller | APF Group, Inc., d/b/a A.P.F. Master Framemakers, a/k/a APF Munn |
|---|---|
| Purchaser | APF Management Company, LLC |
| Purchase Price | $2,126,616.00 payable as follows: (i) cash in the amount of one million four hundred thousand dollars ($1,400,000) (the "Cash Portion"); (ii) Purchaser satisfying the requirements under Section 365 of the Bankruptcy Code to, among other things, cure the full amount of any and all financial defaults under the Yonkers Lease, in the amount of six hundred one thousand six hundred sixteen dollars ($601,616) (the "Yonkers Cure Payment"); and (iii) Purchaser's assumption of up to ($125,000) of the Debtor's current ordinary course vendor payables as of the Closing Date. |
| Purchased Assets | Purchased Assets[2] shall mean substantially all of the Seller's assets, including without limitation: (i) Inventory; (ii) supplies, equipment, computer hardware, telecommunication systems, printers, servers, machinery, furniture, fixtures, automobiles, trucks, vehicles, leasehold improvements, and other tangible property; (iii) trade and other accounts receivable; (iv) Intellectual Property owned or used by Seller; (v) Assigned Leases and the Contracts; (vi) all of Seller's rights, claims, counterclaims, credits, causes of action and rights of set-off against third parties related to the Business or otherwise related to the Assumed |

---

[1] Certain of the schedules to the APA contain proprietary and confidential information which will be made available upon request to parties interested in participating in the auction, subject to the execution and delivery of a confidentiality agreement to the Debtor.

[2] Capitalized terms used herein not otherwise defined shall have the meaning ascribed in the APA.

| | |
|---|---|
| | Obligations, Purchased Assets or Assigned Contracts; (vii) Permits, business licenses, and other authorizations of Governmental Authorities and third parties; (viii) any warranties, indemnities and guarantees of third parties on any Purchased Assets; (ix) any books; (x) any claims, deposits, security deposits and other security, prepaid expenses and other prepayments, and prepaid assets; (xi) telephone numbers; (xii) any accounts of Seller necessary for the operation of the Business; (xiii) all cash generated by the operation of the Business or received by the Business on and after the Closing Date; and (xiv) goodwill. |
| **Excluded Assets** | The Purchased Assets do not include the following assets of the Debtor, which shall be retained by the Debtor and are not being sold or assigned to the Purchaser (all of the following are referred to collectively as the "Excluded Assets"): (i) the Purchase Price; (ii) assets listed on Exhibit D of the APA; (iii) avoidance actions arising under Chapter 5 of the Bankruptcy Code and all proceeds thereof; (iv) capital stock of the Debtor; (v) Excluded Confidential Information; (vi) cash, cash equivalents, securities and investments owned or held by the Debtor as of the Closing Date; (vii) insurance policies and insurance Contracts, coverage, and claims owned by or payable to the Debtor; (viii) any assets of any "employee benefit plan" held or administered by the Debtor; and (ix) all Contracts other than the Assigned Contracts. |
| **Stalking Horse Protections** | In the event that the Purchaser is not the successful bidder at an auction sale, the Purchaser shall be entitled to: (i) an eighty five thousand dollar ($85,000) break-up fee (the "Break Up Fee") payable in the event such higher and better offer closes on a sale; and (ii) an eighty five thousand dollar ($85,000) expense reimbursement (the "Expense Reimbursement"). The Break Up Fee and Expense Reimbursement shall be paid from the proceeds of the sale, or such other assets available in the Debtor's estate, and the obligation to pay the Break Up Fee and the Expense Reimbursement shall be afforded a super priority administrative expense claim in the Debtor's bankruptcy proceeding. |
| **Representations and Warranties; Covenants** | The representations and warranties and covenants are customary for a transaction of this type, including, without limitation, representations warranties regarding the authority to enter into the sale transaction and the agreement to abide by all laws with respect to the sale, litigation, material contracts, permits, environmental matters, employee benefits, ownership of real property, taxes, condition of the Purchased Assets, and covenants regarding conduct of the Business in the pre-Closing period, contract cure obligations, the best efforts of the parties, notices and consents, access to information and the risk of loss. |
| **Closing Date** | The Closing Date and time shall be at 10:00 a.m. eastern time on the first (1st) Business Day that is fourteen (14) days following the date of the |

| | |
|---|---|
| | entry of the Sale Order unless the Court approves the waiver of the fourteen (14) day stay of the Sale Order, in which event the Closing Date shall be the first (1st) Business Day following the date of the entry of the Sale Order.   The Closing shall take place at the New York Offices of Troutman Sanders LLP. |
| **Additional Disclosures** | The Purchaser has approached the Debtor's principal, Max Munn, regarding an employment agreement with the Purchaser post closing. Although no employment agreement has been negotiated or entered into as of this date, a condition precedent to the Purchaser's obligation to close is that the Purchaser and Max Munn agree to the terms of an employment agreement acceptable to the Purchaser.  Additionally, there is a possibility that Mollie Munn, who is the daughter of Max Munn, may, in the future, attempt to acquire an interest in the Purchaser. |

## RELIEF REQUESTED AND BASIS FOR RELIEF

23.     By this motion, the Debtor is seeking entry of two orders, the Sale Procedures Order, substantially in the form annexed hereto as **Exhibit B** and the Sale Approval Order, substantially in the form annexed hereto as **Exhibit G**.

### I.     Sale Procedures Order

#### A.     The Proposed Bidding Procedures

24.     The Sale of the Assets pursuant to the APA is subject to higher and/or better offers. In order to ensure that the highest and best price is received for the Assets, the Debtor has established the proposed Bidding Procedures to govern the submission of competing bids at an Auction. Accordingly, the Debtor seeks this Court's approval of the Bidding Procedures set forth in **Exhibit C** and incorporated herein in their entirety.

25.     As part of the Bidding Procedures, the Debtor seeks approval of a Break-Up Fee in favor of the Purchaser in the amount of $85,000, which Break-Up Fee represents 3.996% of the Purchase Price under the APA.  The Debtor also seeks approval of an Expense Reimbursement for the Purchaser, in the amount of $85,000, for total Stalking Horse Protections

of $170,000. The Stalking Horse Protections are reasonable in this transaction to reimburse the Purchaser's necessary legal, accounting, consulting and due diligence fees to negotiate and enter into the APA. The Break-Up Fee is payable only upon the closing of a transaction involving a sale of the Assets by the Debtor to a Successful Bidder other than the Purchaser, that is higher and/or better than the terms and conditions of the APA, following an Auction in which the Purchaser is the stalking horse bidder (an "Alternative Transaction"). Pursuant to the APA, the payment of the Stalking Horse Protections shall constitute an allowed super-priority administrative expense claim in the Debtor's estate, and will be paid from the sale proceeds of such Alternative Transaction, or such other assets that are available in the Debtor's estate.

26.     In addition, the Bidding Procedures provide that bidders submit an initial overbid in an amount not less than $200,000 in excess of the Purchase Price under the APA, which amount is $30,000 in excess of the Stalking Horse Protections.

27.     All bids submitted for the purchase of the Debtor's Assets shall remain open, and all deposits held in the attorney escrow account of the Debtor's counsel until the sale of the Debtor's Assets to the Successful Bidder is consummated. In the event that the Successful Bidder is unable to consummate on the sale of the Debtor's Assets, the next highest and/or best bidder (the "Backup Bidder") will then be required to close on the sale of the Debtor's assets. However, if the Purchaser is the Backup Bidder, the Purchaser's bid shall remain open for 14 days after the Sale Hearing, unless otherwise agreed between the Debtor and the Purchaser.

28.     In determining whether bidding procedures governing the sale of a Debtor's assets are adequate, courts have consistently deferred to the Debtor's business judgment for their specific industry. See, In re Integrated Resources, Inc., 147 B.R. 650, 656-57 (Bankr. S.D.N.Y. 1992) (Court held that where overbid procedures are negotiated by the chapter 11 debtor, the

business judgment rule applies and said procedures are "presumptively valid").

29.     Furthermore, the purpose of bidding procedures is to solicit the highest and best bid, which would in turn best benefit the creditors. In re Financial News Network Inc., 980 F.2d 165 (2nd. Cir. 1992) ( Bankruptcy court's principal responsibility relating to bidding procedures that govern sale is to secure best possible bid for benefit of creditors.)

30.     Thus, courts deem appropriate those bidding procedures intended to maximize the value of the Debtor's estate. See, e.g., Financial News, 980 F.2d at 170-71 (Bankruptcy court allowed bidder to supplement one of two bids for Chapter 11 Debtor's assets after bidding was closed since the revision was consistent with both rules by which particular auction was being conducted and reasonable expectations of bidders.); Integrated Resources, 147 B.R. at 656-57

31.     The Debtor believes that the Bidding Procedures proposed will result in generating serious parties' interest in acquiring the Debtor's Assets, and will result in realizing the full value of the Debtor's Assets. The Debtor's Bidding Procedures are designed to facilitate a competitive bidding process in an expeditious manner. The Bidding Procedures will allow the Debtor to conduct the Auction in an open fashion that will encourage participation from those bidders that demonstrate they are financially capable to consummate the transaction.

32.     In addition, the Bidding Procedures provide for an "overbid" provision. For a bid to be considered, it must be at least $2,326,616, which amount equals the Purchaser Price under the APA, plus $200,000 (the "Initial Minimum Overbid"). Each overbid increment after the Initial Minimum Overbid must be at least $10,000.00 higher than the previous bid.

33.     The Initial Minimum Overbid is necessary not only to compensate the Debtor for the risk that it assumes in foregoing a known, willing and able purchaser for a new potential acquirer, but also to ensure that there is an increase in the net proceeds to the estate, after payment

of the Stalking Horse Protections. The Debtor believes that the Initial Minimum Overbid will enable competitive bidding and maximize the value of the Debtor's Assets, without any chilling effect.

34. The Debtor believes, in its business judgment, that the Bidding Procedures are adequate and will result in maximizing the value of its Assets, and are therefore appropriate under the relevant standards governing auction proceedings.

**B.     Exigent Circumstances Necessitating an Expedited Sale**

35. Under §1125(a)(5)(B) of the Bankruptcy Code, the sale of an asset of a debtor's estate may occur through a plan of reorganization. In addition, a sale of an asset, or all of the Debtor's assets, may take place outside of the context of a plan under certain circumstances.

36. Section 363 of the Bankruptcy Code, and Rule 6004 of the Bankruptcy Rules, authorize pre-confirmation sales of a debtor's assets when (i) notice has been given to all creditors and interested parties; (ii) the sale contemplates a fair and reasonable price; and (iii) the purchaser is proceeding in good faith.

37. The Second Circuit decision of *In re Lionel Corp.* 722 F. 2d 1063 (2d Cir. 1983) expanded the circumstances where a pre-confirmation sale of an asset of a Chapter 11 debtor's estate was appropriate, and established the standard for a court's determination of whether to authorize a sale, requiring the Court to consider all of the "salient factors pertaining to the proceeding" and to act to further the diverse interests of the debtor, its creditors and its equity holders. *Lionel*, 722 F2d at 1071. In Lionel, the Second Circuit set forth a non-exhaustive list of factors to consider in determining whether a pre-confirmation sale of assets is appropriate:

- the amount of elapsed time since the filing;
- the likelihood that a plan of reorganization will be proposed and confirmed in the near future;
- the effect of the proposed disposition on future plans of reorganization;

- the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property;
- which of the alternatives of use, sale or lease the proposal envisions; and
- whether the asset is increasing or decreasing in value.

*See also, Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.,* 554 U.S. 33 (2008); *Consumer News & Bus. Channel P'ship v. Fin. News Network Inc. (In re Fin. News Network Inc.),* 980 F.2d 165 (2d Cir. 1992); *Licensing By Paolo, Inc. v. Sinatra (In re Gucci),* 126 F.3d 380 (2d Cir.1997); *Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC),* 478 F. 3d 452 (2d Cir. 2007); *In re Chrysler LLC,* 405 B.R. 84 (Bankr. S.D.N.Y. 2009).

38. Applying the *Lionel* factors to this chapter 11 proceeding, the Debtor submits that the factors have been satisfied based on the following:

- Over sixteen (16) months have passed since the Debtor's chapter 11 filing;

- The Debtor endeavored to proceed with confirming its Third Amended Chapter 11 Plan, but failed after the Debtor lost its plan funder, and at this juncture the possibility of reorganization in the near future is unlikely;

- The proposed sale seeks to liquidate the value of the Debtor's estate to maximize the value of the estate for the benefit of the Debtor's creditors. The ultimate distribution of sale proceeds to the Debtor's creditors vis-a-vis a liquidating plan, or alternatively a conversion or dismissal of this case, will be determined upon the completion of the auction sale;

- Although the Purchaser's offer of $2,126,616 is less than the valuation set forth in the Debtor's Third Amended Disclosure Statement, without an immediate sale of the Debtor's assets, the Debtor will no longer be able to afford to remain in operation in chapter 11. Should the Debtor's operations cease, the Debtor's estate could no longer be sold as a "going concern" and would be liquidated at a fraction of the Purchase Price.

39. In a recent decision, the Supreme Court recognized that a pre-confirmation sale of assets is in the best interests of the debtor's estate when there is a need to preserve the going concern value of the debtor's estate because revenues are not sufficient to support the continued operation of the business and there are no viable sources for financing. *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.,* 554 U.S. 33 (2008).

40. In a recent decision, S.D.N.Y. Bankruptcy Judge Gerber in *In re General Motors*

*Corp.*, 407 B.R. 463 (2009), approved a pre-confirmation sale of assets, quoting the creditor's committee's justifications to approve the sale.

> The simple fact is that there are no other viable bids-indeed no serious expressions of interest-to purchase GM's assets and no other feasible way for GM to restructure its business to remain viable. The current transaction is the only option on the table. The Court is thus faced with a clear choice: to approve the proposed sale transaction, preserve the going-concern value of the Debtors' businesses, and maximize substantial value for stakeholders (despite the pain that this course will inflict on numerous innocent parties), or reject the transaction and precipitate the dismantling and liquidation of GM to the detriment of all involved. *Preventing this harm serves the core purposes of the Bankruptcy Code and constitutes a strong business justification under Section 363 of the Code to sell the debtors' assets outside of a plan process.*

*General Motors,* 407 B.R. at 493.

41. The reasoning cited in the *General Motors* decision supporting a pre-confirmation sale parallels the situation in this proceeding. The Debtor has gone through extensive efforts to reorganize its affairs, to no avail, and is now in a position with insufficient operating capital to sustain operations. Without an immediate pre-confirmation sale, the Debtor's operations will cease and the Debtor will "go dark." All 98 of the Debtor's employee will be unemployed. The Debtor's small business vendors, which rely on the Debtor's continued business, will lose the Debtor's account and the revenue therefrom. There would be an undoubted trickle effect of loss in the community. Although an immediate pre-confirmation sale of substantially all of the Debtor's assets is not the first avenue for a "reorganization", in this instance it is the result of an unfortunate failed attempt at confirming a plan of reorganization. The Debtor submits that a sale is appropriate, and serves the best interests of its estate and its creditors.

**C.    Marketing of the Debtor's Assets**

42. The Debtor, in conjunction with the Official Committee of Unsecured Creditors, has spent over one (1) year marketing the Debtor's Assets, including marketing in connection

with the funding of its Third Amended Plan of Reorganization. The Debtor has had serious discussions and negotiations with over five (5) interested parties, which negotiations resulted only in the Purchaser's offer. The Debtor believes that its efforts over the past year have satisfied its requirement to market its Assets as well as to test the market for a fair valuation of the Debtor's Assets.

43. Notwithstanding, the foregoing, the Debtor proposes to market the auction sale of its Assets via two avenues: (i) notifying all of the Debtor's creditors and parties that previously expressed an interest in acquiring the Debtor's Assets of the auction sale and bidding procedures; and (ii) publishing a notice, substantially in the form annexed as **Exhibit D** (the "Publication Notice") once in *The New York Times* news paper the week of January 24, 2011. The Debtor believes that this marketing will promote the marketing and sale of the Assets to other interested parties, while preserving the very limited assets remaining in the Debtor's estate and expediting the sale process to preserve the going concern of the Debtor.

**D.     The Break-Up Fee and the Expense Reimbursement are Appropriate**

44. Is has become an established practice in chapter 11 cases to approve break-up fees, expense reimbursements and other forms of bidding protections in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code. See, e.g., Integrated Resources, 147 B.R. at 662; In re 995 Fifth Ave. Assoc., L.P., 96 B.R. 24 (Bankr. S.D.N.Y. 1989). Break-up fees enhance the bidding process by inducing a "white knight" to submit a bid by providing compensation for the risks it is undertaking and to cover the costs of due diligence. 995 Fifth Ave. Assoc., 96 B.R. at 28.

45. Generally, Courts approve break-up fees unless they are unreasonable or appear more likely to chill the bidding process than to enhance it. Integrated Resources, 147 B.R. at 662.

When examining whether break-up fees are reasonable and appropriate, courts examine: (1) the relationship between the parties negotiating the break-up fee for any self-dealing or taint; (2) whether the fee hampers, as oppose to enhances, bidding; and (3) whether the amount of the break-up fee is unreasonable as compared to the purchase price. Id.

46.     The Break-Up Fee in this instance is appropriate because (1) the Debtor and the Purchaser negotiated at arms length, (2) the Break-Up Fee provided an incentive for the Purchaser to enter into the APA and invest significant monies and efforts negotiating same and conducting its due diligence, all while not knowing whether it will be the Successful Bidder, and (3) the amount of the Break-Up Fee and Expense Reimbursement in the event the Purchaser is outbid is reasonable in relation to the Purchase Price. Moreover, the Break Up Fees are in the same order of magnitude as break-up fees approved in other cases. See, e.g., Financial News, 98 F.2d at 167 ($8.2 million, or 5.5% break up fee approved on a $149.3 million sale); LTV Aerospace and Defense Co. v. Thomson-CSF, S.A. (In re Chateaugay Corp.), 198 B.R. 848, 861 (Bankr. S.D.N.Y. 1996)($20 million, or 4.4% break-up fee allowed on $450 million offer); Integrated Resources, 147 B.R. at 662 (3.2% break up fee).

47.     In addition to the factors stated above, payment of the Stalking Horse Protections will have resulted in obtaining an initial offer which provides a minimum floor bid on which other bidders may rely. Therefore, under the circumstances, the Stalking Horse Protections are appropriate.

48.     Bankruptcy Rule 2002(a) and (c) requires the Debtor to notify creditors of the proposed sale of the Assets, including the date, time and place of the Auction, terms of the Sale, and the deadline for filing any objections.

49.     The Debtor proposes to comply with these requirements by serving, via first class

mail, within three (3) days of entry of the Sale Procedures Order, copies of: (i) the Sale

Procedures Order, (ii) the Bidding Procedures, and (iii) this Motion.

50.     The Debtor proposes to serve the following parties: (i) the Office of the U.S.

Trustee, (ii) all taxing authorities, (iii) counsel to the Purchaser, (iv) creditors committee counsel,

(v) all creditors, (vi) all counterparties to executory contracts and leases; (vii) all notices of

appearance; and (viii) all potential buyers known by the Debtor.

51.     In addition, the Debtor will publish the Publication Notice once in *The New York*

*Times* news paper the week of January 24, 2011. The Debtor believes this will promote the

marketing and sale of the Assets.

52.     The Debtor submits that the foregoing notice fully complies with the requirements

set forth in Bankruptcy Rule 2002. Based upon the foregoing, the Debtor respectfully requests

that this Court approve the form and manner of the notice proposed above.

**E.      Procedures for Lease Cure Claims And
          Adequate Assurance of Future Performance**

53.     Set forth on the schedule annexed as **Exhibit E** are the Assumed Agreements and

the amounts the Debtor has determined will be, as of the closing date of the sale to Purchaser or

the Successful Bidder, as the case may be, the amounts necessary to be paid by the Debtor

pursuant to §365 of the Bankruptcy Code in order to assume and assign such executory contract

and/or unexpired lease to Purchaser or the successful bidder (the "Cure Amount").  The Debtor

requests that unless the non-Debtor party to an executory contract or unexpired lease (each a

"Third Party", and collectively, the "Third Parties") files an objection to this Motion asserting a

claim for any amounts due and owing under an executory contract and/or unexpired lease in an

amount different than the Cure Amount (the "Disputed Cure Amount") on the objection deadline

for the Sale Approval Hearing (the "Cure Objection Deadline"), that such third party to the

subject Executory Contract and/or Unexpired Lease will be forever barred from asserting a Cure Amount different from that set forth and from asserting any additional cure or other amounts with respect to its Unexpired Lease and/or Executory Contract, relating to the period prior to assignment.

54.     Furthermore, the Debtor requests that any Cure Amounts, or Disputed Cure Amount that is fixed by the Court or otherwise agreed by the Debtor (the "Resolved Cure Amount") be deemed to include any such other pecuniary or other losses, if any, under the respective executory contract and/or unexpired lease.  Consequently, payment of any Cure Amounts and/or Resolved Cure Amount, as determined by the Court or otherwise agreed to by the Debtor, will compensate the appropriate party for any such other loss.

55.     The Sale Approval Hearing (at which the assumption and assignment of an Executory Contract and/or Unexpired Lease will be considered) gives the other parties in interest an opportunity to consider any assignment issues that may be resolved only after identification of a particular assignee and an opportunity to file objections, if any, to such matters.

56.     Under these circumstances, the Debtor submits that it has established, or will establish at the Auction and/or the Sale Approval Hearing, the requisite adequate assurance of future performance pursuant to § 365 of the Bankruptcy Code with respect to the potential assumption and assignment of the Executory Contracts and/or Unexpired Leases.

**II.     Sale Approval Order**

**A.     This Court Should Approve the Sale of the Debtor's Assets to the Successful Bidder**

57.     Following the Auction, the Debtor will seek this Court's approval of the sale of the Debtor's Assets, free and clear of all liens, claims and encumbrances to the bidder that submits the highest and best offer at the Auction (the "Successful Bidder").

58.     All of the sale proceeds will be received by the Debtor, with all liens, claims and encumbrances to attach to the proceeds in accordance with Section 363(f) of the Bankruptcy Code.

59.     Pursuant to Section 363 (b) and (f) of the Bankruptcy Code, the Debtor seeks entry of an order authorizing the sale, assignment and transfer the Assets. Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  Section 363(f) of the Bankruptcy Code states as follows:

> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if--
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute;  or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

60.     The conditions set forth in 11 U.S.C. §363(f) are in the disjunctive, which means that only one of the tests must be met. The Debtor believes that the Purchase Price for the sale of the Purchased Assets in this manner is in the best interests of the Debtor's estate and its creditors for a variety of reasons, including the following: (i) the Debtor believes that an immediate sale of the Purchased Assets is in the best interests of the Debtor's estate and its creditors; (ii) the Purchase Price is adequate and represents fair market value of the Assets to be sold; and (iii) the

sale proceeds will either be used to fund a liquidating plan of reorganization or will be distributed in an orderly distribution to non-insider creditors.

61.     It is therefore submitted that Section 363(f) of the Bankruptcy Code is satisfied and an immediate sale of the Assets is in the best interests of creditors and the estate and will prevent unnecessary, irreparable harm to the creditors and the estate.

62.     In connection with this motion, the Debtor proposes to invite interested parties to make higher or better offers by way of conducting an auction of the Debtor's Assets in contemplation of a sale free and clear of all liens, claims and encumbrances, with all such liens, claims and encumbrances to attach to the sale proceeds.

63.     The Debtor seeks authority to conduct the Auction free and clear of all liens with the liens to attach to the proceeds of sale (i.e., gross proceeds, less expenses) pursuant to §363(f) of the Bankruptcy Code. Since the Auction contemplated hereby is not in the ordinary course, its authorization requires notice and a hearing pursuant to Section 363(b) of the Bankruptcy Code. Auction sales are specifically authorized under the Bankruptcy Code, and Bankruptcy Rule 6004(f) which provides that, "[a]ll sales not in ordinary course of business may be by private sale or public auction."

64.     It is within the discretion of the Court to determine whether to approve or disapprove of a method for the disposition of property.  In re Alves, 52 B.R. 353 (Bankr. D.R.I. 1985); See, generally, In re Stogsdill, 102 B.R. 587 (Bankr. W.D. Tex. 1989). As stated above, the Assets include (i) all inventory held at a location or facility of Seller, (ii) all furniture, equipment, machinery and instruments of every kind and wheresoever located, (iii) all customer lists, customer records, (iv) all tangible personal property, (v) all of the intellectual property, and (vi) all names, tradenames and goodwill of the Seller.

65.     The Debtor respectfully submits that the APA, subject to higher and better offers received at an Auction, will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative.  In addition, the terms and conditions of the APA will be tested in the market through an auction process, which will support the fairness and reasonableness of the consideration being received. Therefore, the Debtor request that the Court authorize and approve the APA.

**B.      Assumption and Assignment of the Assumed Leases
          To the Successful Bidder is Proper**

66.     In connection with the sale of Assets, the Debtor seeks authority to assume and assign the Debtor's interest in certain leases and executory contracts (the "Assumed Agreements"), to the Successful Bidder pursuant to §365 of the Bankruptcy Code. To enable the Debtor to sell all of the Assets, the Debtor requests authority to assume and assign the Assumed Agreements to the Successful Bidder following the Auction.

67.     Section 365(b)(1) of the Bankruptcy Code authorizes a debtor-in-possession to assume, assume and assign, or reject executory contracts and unexpired leases subject to the approval of the Bankruptcy Court, on the condition, *inter alia*, that the Debtor cures any default under the executory contract or unexpired lease and provides adequate assurance of future performance under such contract or lease. The meaning of adequate assurance of future performance depends is fact sensitive to each case, but should be given "practical, pragmatic construction". See, e g. Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989), In re Natco Industries, Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that such party will thrive and pay rent). A potential assignee can provide adequate assurance by, *inter alia*, demonstrating its financial health and experience in managing the type of property being

assigned. <u>In re Bygraph, Inc.</u>, 56 B.R. 596, 605-606 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is demonstrated when a prospective assignee of a lease from a debtor has financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

68.     In connection with the Bidding Procedures, bidders will be required to submit, among other things, written evidence of their ability to provide adequate assurance of future performance under the applicable leases, such as current financial statements or current bank account statements. In order to facilitate the Auction, and to not cause any potentially chilling effect, the Debtor believes that any objection relating to a prospective assignee's ability to provide adequate assurance of future performance under §365 of the Bankruptcy Code should be heard and adjudicated at the Sale Hearing.

69.     The Cure Amount owed to Hampshire Management Company, LLC for the non-residential real property lease for the Debtor's warehouse in Yonkers, New York is $601,616. There are no additional cure requirements under the Assumed Contracts.

70.     Any assumption and assignment of the Assumed Agreements will be subject to all of the provisions of such lease, to the extent required by applicable law, and will be subject to all of the applicable provisions of the Bankruptcy Code. The proposed terms and conditions of the Auction are designed to ensure that any assignees are financially healthy and prepared to undertake the obligations for which they are bidding.

71.     Accordingly, the Debtor submits that it will have established, or will establish, adequate assurance of future performance pursuant to section 365 of the Bankruptcy Code with respect to prospective assignment of the Assumed Agreements.

**C.     Estimated Distribution of Sale Proceeds**

72. The Debtor's estate has, or is anticipated to have, the following estimated liabilities:

| Creditor | Type of Claim | Est. Amount Owed As of 1/1/11 |
| --- | --- | --- |
| US Trustee Fees (est.) | Administrative | $1,625 |
| Chapter 11 Professional Fees (est.[3]) | Administrative | $450,000 |
| NYS Department of Tax & Finance | Administrative | $93,000 |
| NYS Unemployment Insurance | Administrative | $25,000 |
| Union | Administrative | $170,000 |
| Internal Revenue Service | Administrative | $269,000 |
| Misc. Trade Payables | Administrative | $200,000 |
| Hampshire Management Company LLC | Administrative | |
| | Cure Payment | $601,616 |
| First Niagara Bank | Secured | $2,100,000 |
| New York Business Dev. Corp. | Secured | $1,580,000 |
| Empire State Development Corp | Secured | $121,582 |
| Priority Claims | Priority | $391,621.30 |
| General Unsecured Claims | Unsecured | $7,500,000[4] |

73. The Purchaser's offer of $2,126,616 for the Debtor's Assets is not sufficient to provide for a distribution to the Debtor's priority or general unsecured creditors. For there to be a distribution to unsecured creditors, additional higher bids would have to be obtained at the auction in excess of $5.5 million.

74. Fees owed for United States Trustee Fees under 28 U.S.C. Section 1930 and statutory interest, if any, pursuant to 31 U.S.C. Section 3717, through the closing of the case shall be carved out from the Sale Proceeds as per the agreement between the Secured Lender and the Professionals. Additionally, the Professionals reserve their rights to their claims under §506(c) of the Bankruptcy Code.

---

[3] Pursuant to the Final Cash Collateral Order entered in this Chapter 11 Case (Docket No. 46), the chapter 11 professional claims, to the extent allowed and awarded, are "carved out" and therefore senior in priority to all secured claims of the Debtor.

[4] This amount includes the deficiency claim of Alliance under §506(a) of the Bankruptcy Code in the amount of $5,230,388.

**D.      Granting the Successful Bidder Good Faith Status is Appropriate**

75.      Section 363(m) of the Bankruptcy Code provides as follows:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease  under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

76.      The Debtor respectfully requests that the Court enter an order granting Purchaser "good faith purchaser" status pursuant to § 363(m) of the Bankruptcy Code.

77.      As set forth hereinabove, Purchaser has negotiated the APA in good faith and at arms length with the Debtor. The Purchaser is a third party unrelated to the Debtor, is not an "insider" of the Debtor within the meaning of § 101(31) of the Bankruptcy Code, and is not controlled by, or acting on behalf of, any insider of the Debtor or the Debtor itself. Furthermore, Purchaser has separate counsel who negotiated the terms of the APA with Debtor's counsel.

78.      Based upon the foregoing, the Debtor respectfully submits that Purchaser has taken part in the transaction contemplated hereby in a manner consistent with granting it "good faith purchaser" status, and the protections concomitant with such status.

**E.      The Fourteen Day Stay of the Order Should be Waived**

79.      Federal Rule of Bankruptcy Procedure 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."

80.      The Debtor hereby requests that the Court, in its discretion, waive the fourteen (14) day stay imposed by Rule 6004(h).

81.     The Debtor suggests that good cause exists for such a waiver. First, all parties have agreed to and are prepared to close within one (1) business day of the Sale Order becoming final and non-appealable. In addition, the Debtor will incur additional administrative costs if it is prevented from closing before such time and as such, the Debtor seeks such a waiver. Artificially expanding the time that the Debtor must hold the property prior to a closing only increases those costs.

82.     For the foregoing reasons, the Debtor requests that the Court waive the fourteen-day stay consistent with the provisions of Federal Rule of Bankruptcy Procedure 6004(h).

## REQUEST FOR HEARING ON SHORTENED NOTICE

83.     The Debtor is requesting a hearing on shortened notice on the relief requested in this Motion.  As set forth in further detail below, the Debtor believes that good cause exists to have a hearing on the Motion on shortened notice as provided for Rule 9006.

84.     Typically, a motion to use, sell or lease property of the estate is a twenty-one (21) day motion pursuant to Rule 2002. However, the Rule 9006 provides for a shortening of time under certain circumstances. Federal Rule of Bankruptcy Procedure 9006(c) provides as follows:

(c) *Reduction.*

(1) *In General*. Except as provided in paragraph (2) of this subdivision, when an act is required or allowed to be done at or within a specified time by these rules or by a notice given thereunder or by order of court, the court for cause shown may in its discretion with or without motion or notice order the period reduced.

(2) *Reduction Not Permitted*. The court may not reduce the time for taking action under Rules 2002 (a)(4) and (a)(8), 2003(a), 3002(c), 3014, 3015, 4001(b)(2), (c)(2), 4003(a), 4004(a), 4007(c), 8002, and 9033(b).

85.     Thus, the Bankruptcy Rules specifically authorize the Court to hear a motion such

as this Motion on shortened notice.

86.　The Debtor respectfully avers that sufficient cause exists for scheduling a hearing on shortened notice to consider the Motion. Specifically, the Debtor has continued to operate at a loss, has accrued post petition liabilities, and currently has a lack of adequate working capital. Based upon the Debtor's continued losses and lack of cash availability, an immediate sale of the Debtor's Assets is necessary to prevent further operating losses and an imminent business cessation, all of which would be to the detriment of the Debtor's estate and its creditors. Annexed hereto as **Exhibit F** is an affidavit of Jonathan S. Pasternak pursuant to Local Bankruptcy Rule 9077-1, in support of a hearing on shortened notice.

87.　As set forth in the proposed Order Scheduling Hearing, notice of this Motion will be has been provided by overnight delivery, facsimile or email on or before January 14, 2011, upon: (i) Office of the United States Trustee; (ii) counsel to the Committee; (iii) counsel to the Purchaser; (vi) all counterparties to each of the Debtor's executory contracts and/or leases, and (vii) parties who have filed notices of appearance. The Debtor submits that said notice is adequate and proper.

## NO PRIOR REQUEST

88.　No prior Motion for the relief requested herein has been made to this or any other Court.

## CONCLUSION

89.　For all of the foregoing reasons, the Debtor respectfully request entry of the Sale Procedures Order, substantially in the form annexed hereto as **Exhibit B**, and after the Auction and a Sale Hearing, entry of the Sale Approval Order substantially in the form annexed hereto as **Exhibit G**.

**WHEREFORE,** the Debtor respectfully request that the Court grant the relief requested

herein, together with such other and further relief as is just and proper under the circumstances.

Dated: Harrison, New York
January 12, 2011

RATTET, PASTERNAK & GORDON OLIVER, LLP
Attorneys for the Debtor
550 Mamaroneck Avenue
Harrison, New York 10528
(914) 381-7400

By: */s/ Jonathan S. Pasternak*
Jonathan S. Pasternak

APF GROUP, INC.
DEBTOR-IN-POSSESSION


By: _/s/ Max Munn_____
Max Munn, President and CEO