_____

**ASSET PURCHASE AGREEMENT**
_____


**By and Between**


**APF Group, Inc., d/b/a A.P.F. Master Framemakers,
a/k/a APF Munn**


**and**


**APF Management Company, LLC**




**Dated as of January _____, 2011**

# TABLE OF CONTENTS

**Page**

ARTICLE I.    - SALE AND PURCHASE OF ASSETS ............................................................ 1

    1.01    Sale and Purchase of Assets ........................................................................ 1

    1.02    Payment for Assets ....................................................................................... 7

    1.03    Tax and Related Matters ............................................................................... 7

ARTICLE II.    - CLOSING ................................................................................................... 8

    2.01    Closing ......................................................................................................... 8

    2.02    Deliveries by Seller ...................................................................................... 8

    2.03    Deliveries by Buyer ...................................................................................... 9

    2.04    Termination in Absence of Closing ............................................................. 9

ARTICLE III.    - REPRESENTATIONS AND WARRANTIES OF SELLER ......................... 11

    3.01    Organization, Standing and Qualification ................................................. 11

    3.02    Power and Authority ................................................................................... 11

    3.03    Financial Statements ................................................................................... 11

    3.04    Title to Assets; Liens and Encumbrances .................................................. 12

    3.05    No Subsidiaries ........................................................................................... 12

    3.06    Contracts and Commitments ....................................................................... 12

    3.07    Undisclosed Liabilities ............................................................................... 12

    3.08    Compliance with Laws ............................................................................... 13

    3.09    Litigation; Decrees ..................................................................................... 13

    3.10    Taxes ........................................................................................................... 13

    3.11    Insurance ..................................................................................................... 13

    3.12    No Material Adverse Changes .................................................................... 13

    3.13    Employees ................................................................................................... 14

    3.14    Benefit Plans ............................................................................................... 14

    3.15    Return Policies; Warranties; Customer Special Orders ............................. 15

    3.16    Inventories .................................................................................................. 15

    3.17    Capital Expenditure Commitments ............................................................ 15

    3.18    Real Property ............................................................................................... 15

    3.19    Intellectual Property ................................................................................... 16

3.20 Licenses ........................................................................................................ 18

3.21 Purchased Assets Necessary to the Business ........................................... 18

3.22 Absence of Environmental Liabilities ....................................................... 18

3.23 Accounts Receivable ................................................................................... 18

3.24 Brokers .......................................................................................................... 18

3.25 Disclosure ..................................................................................................... 18

3.26 Updates ......................................................................................................... 19

ARTICLE IV. - REPRESENTATIONS AND WARRANTIES OF BUYER .......................... 19

4.01 Organization and Standing ........................................................................ 19

4.02 Authorization .............................................................................................. 19

4.03 Brokers .......................................................................................................... 20

ARTICLE V. - OBLIGATIONS PRIOR TO CLOSING .................................................... 20

5.01 Buyer's Access to Information and Properties ......................................... 20

5.02 Seller's Conduct of Business and Operations ......................................... 20

5.03 Notification of Certain Matters ................................................................. 21

5.04 Employee Cooperation ............................................................................... 21

5.05 Addition, Supplementation and Amendment of Schedules ................. 21

5.06 Transitional Access ..................................................................................... 22

ARTICLE VI. - CONDITIONS TO SELLER'S AND BUYER'S OBLIGATIONS ................ 22

6.01 Conditions to Obligations of Seller .......................................................... 22

6.02 Conditions to Obligations of Buyer .......................................................... 23

ARTICLE VII. - BANKRUPTCY COURT APPROVAL .................................................... 24

7.01 Bankruptcy Approval Necessary ............................................................... 24

7.02 Waiver of Conditions .................................................................................. 25

7.03 Executory Contracts .................................................................................... 25

ARTICLE VIII.- POST-CLOSING OBLIGATIONS ........................................................ 26

8.01 Employment ................................................................................................. 26

8.02 Further Assurances ..................................................................................... 26

8.03 Maintenance and Disposition of Records ................................................ 26

8.04    Name Change ........................................................................................ 26

ARTICLE IX.    – INDEMNIFICATION ........................................................... 27

9.01    Survival ............................................................................................... 27

9.02    Seller's Agreement to Indemnify ....................................................... 27

9.03    Limitations on Seller's Agreement to Indemnify ............................... 28

ARTICLE X.    - MISCELLANEOUS................................................................. 28

10.01    Prorations ......................................................................................... 28

10.02    Confidentiality .................................................................................. 29

10.03    Costs and Expenses .......................................................................... 29

10.04    Notices .............................................................................................. 29

10.05    Governing Law ................................................................................. 30

10.06    Entire Agreement; Amendments and Waivers.................................. 30

10.07    Binding Effect and Assignment ....................................................... 30

10.08    Remedies ........................................................................................... 31

10.09    Schedules .......................................................................................... 31

10.10    Multiple Counterparts ...................................................................... 31

10.11    Construction ...................................................................................... 31

10.12    Time of the Essence .......................................................................... 31

10.13    Severability ....................................................................................... 31

10.14    No Dissemination/Solicitation. ........................................................ 31

ARTICLE XI.    - DEFINITIONS ...................................................................... 32

11.01    Definitions......................................................................................... 32

11.02    Rules as to Usage ............................................................................. 38

## LIST OF EXHIBITS

| | |
|---|---|
| Exhibit A | Assigned Contracts |
| Exhibit B | Purchased Equipment |
| Exhibit C | Included Assets |
| Exhibit D | Excluded Assets |
| Exhibit E | Excluded Contracts |
| Exhibit F | Assumed Obligations |
| Exhibit G | Bidding Procedures |

## LIST OF DISCLOSURE SCHEDULES

| | |
|---|---|
| Schedule 1.01(a) | Purchase Assets |
| Schedule 1.01(a)(xi) | Telephone Numbers |
| Schedule 1.01(b) | Excluded Assets |
| Schedule 2.02(d) | Consents |
| Schedule 3.01 | Qualifications |
| Schedule 3.02 | Required Consents |
| Schedule 3.03 | Financial Statements |
| Schedule 3.04(b) | Personal Property List |
| Schedule 3.05 | Subsidiaries |
| Schedule 3.06 | Contracts and Commitments |
| Schedule 3.07 | Undisclosed Liabilities |
| Schedule 3.08 | Permits and Consents (Compliance with Laws) |
| Schedule 3.09 | Litigation |
| Schedule 3.11 | Insurance |
| Schedule 3.13 | Employees |
| Schedule 3.14 | Benefit Plans |
| Schedule 3.15(i) | Warranties or Guarantees related to Products |
| Schedule 3.15(ii) | Outstanding Credits |
| Schedule 3.17 | Capital Expenditures |
| Schedule 3.19(i) | Leased Real Property |
| Schedule 3.19(ii) | Rights to Leased Property |
| Schedule 3.19(iii) | Proceedings Related to Leased Property |
| Schedule 3.19(a) | Licensed Intellectual Property |
| Schedule 3.19(b)(i) | Owned Intellectual Property |
| Schedule 3.19(b)(v) | Owned Intellectual Property Licensed by Seller |
| Schedule 3.19(c) | Claims against Intellectual Property |
| Schedule 3.19(e) | Proceedings Related to Intellectual Property |
| Schedule 3.20 | Licenses |
| Schedule 3.23 | Accounts Receivable |
| Schedule 3.24 | Brokers |

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT is made and entered into as of the ___ day of January, 2011 (this "Agreement") by and between (i) APF Management Company, LLC, a New York limited liability company ("Buyer"), and (ii) APF Group, Inc. (d/b/a A.P.F. Master Framemakers, a/k/a APF Munn), a New York corporation ("Seller" and together with Buyer, collectively referred to as the "Parties" and each individually a "Party"), and a debtor and debtor in possession in proceedings under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (as amended, the "Bankruptcy Code"). Capitalized terms used in this Agreement shall have the meanings ascribed to them in Article XI of this Agreement.

## Recitals

**WHEREAS,** on September 11, 2009 (the "Petition Date"), Seller filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), Case No. 09 B 23696 (RDD) (the "Bankruptcy Case").

**WHEREAS,** Seller is operating as a debtor in possession, no trustee or examiner having been sought or appointed, and is continuing in the possession of its assets and in the management of its business under Sections 1107 and 1108 of the Bankruptcy Code.

**WHEREAS,** Seller desires to sell, convey, assign, transfer and deliver, and Buyer desires to purchase, acquire, take assignment of, and accept any and all rights, title and interest of Seller in, to and under the Purchased Assets, on the terms, provisions and conditions set forth in this Agreement, pursuant to Sections 363 and 365 of the Bankruptcy Code.

## Agreement

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants contained herein, the Parties agree as follows:

## ARTICLE I. - SALE AND PURCHASE OF ASSETS

1.01    Sale and Purchase of Assets.

(a)    Purchased Assets. Upon the terms and provisions, and subject to the conditions of this Agreement, at the Closing, pursuant to Sections 363 and 365 of the Bankruptcy Code, Seller shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire, take assignment of, and accept any and all of Seller's rights, title and interests in, to and under the assets of Seller in existence on the date hereof and any additions thereto on or before the Closing Date related to the Business, whether real, personal, or mixed, whether tangible or intangible, whether accrued, contingent, or otherwise, whether or not carried on the books and records of Seller, including, but not limited to all of Seller's right, title and interest in and to the assets listed in this Section 1.01(a), but excluding all Excluded Assets (collectively, the "Purchased Assets"), free and clear of any and all liens, claims, charges, encumbrances,

mortgages, security interests, pledges, equities and other restrictions or charges of any kind or nature whatsoever, including without limitation all "interests" as such term is defined in Section 363(f) of the Bankruptcy Code (collectively, "Liens"), other than Assumed Obligations, _provided_, _however,_ that (i) at any time prior to the entry of the Procedures Order, or (ii) within fifteen (15) Business Days after the date of the entry of the Procedures Order, Buyer may, by written notification to Seller, provide to Seller a Schedule 1.01(a) which specifically lists certain assets (other than Assigned Contracts which are exclusively addressed in Section 7.03 of this Agreement) to be included for purchase hereunder, which Schedule 1.01(a) shall be deemed to the extent necessary to amend such other Schedules or Sections hereof that may have listed such assets as Excluded Assets, and such assets shall become Purchased Assets, _provided_, _further,_ _however,_ that in no event will the Purchase Price be increased with respect to any such inclusions, nor shall any such inclusions, individually or in the aggregate, give Buyer a right to terminate this Agreement or not close the transaction contemplated hereby. The Purchased Assets shall include, but not be limited to, the following:

(i)  all Inventory owned or used by Seller related to the Business;

(ii)  all supplies, equipment, computer hardware, telecommunication systems, printers, servers, machinery, furniture, fixtures, automobiles, trucks, vehicles, leasehold improvements, and other tangible property owned or used by Seller related to the Business and (A) located at the Assumed Locations, including any and all assets temporarily off-site for repair or other purposes or being shipped to Seller, (B) used by the Assumed Locations although located outside the Assumed Locations, or (C) listed on Exhibit B annexed hereto (collectively, the "Purchased Equipment");

(iii)  all trade and other accounts receivable (including, but not limited to, unbilled accounts receivable) owned by or owed to Seller (collectively, the "Accounts Receivable") and any claim, remedy or other right related to any of the foregoing;

(iv)  all Intellectual Property owned or used by Seller (including, without limitation, foreign and domestic patents, patent applications, including any continuations, continuations-in-part, and derivatives related thereto, and Trade Secrets, trade names, trademarks, all internet websites, domain names, right to the name "APF Group", "A.P.F. Master Framemakers", "APF Munn" and any marks, logos and indicia related thereto, and any permutation, variation or component thereof or other source identifiers,  and all other Owned Intellectual Property), wherever held or registered, including the right to sue and collect damages related thereto for past, present and future infringement of any of the foregoing;

(v)  the Assigned Leases and the Contracts set forth on Exhibit A annexed hereto (collectively, the "Assigned Contracts");

(vi)  all of Seller's rights, claims, counterclaims, credits, causes of action and rights of set-off against third parties related to the Business or otherwise related to the Assumed Obligations, Purchased Assets or Assigned Contracts;

(vii)   Permits, business licenses, and other authorizations of Governmental Authorities and third parties of Seller that are necessary to (A) the occupation of the Assumed Locations, or (B) the operation of the Business to the extent transferable by consent, operation of law, pursuant to the Bankruptcy Code or pursuant to an order by the Bankruptcy Court;

(viii)   any warranties, indemnities and guarantees of third parties on any Purchased Assets;

(ix)   any books of account, ledgers, financial, accounting and Tax records, and all general and personnel records, files, invoices, customers' and suppliers' lists, other distribution and mailing lists, price lists, reports, plans, advertising materials, catalogues, billing records, sales and promotional literature, manuals, and customer and supplier correspondence of Seller that pertain to the Purchased Assets or the Business, whether in hard copy, electronic copy, or other format (collectively, the "Records"), subject to the rights of Seller pursuant to Section 2.02(d) of this Agreement.

(x)   any claims, deposits, security deposits and other security, prepaid expenses and other prepayments, and prepaid assets, notes receivable and other miscellaneous receivables, refunds, causes of action, rights of recovery, rights of setoff, and rights of recoupment as of the Closing Date owned or enforceable by Seller, including, without limitation, (A) accounts receivable, promotional allowances and rebates from vendors, (B) prepayments and deposits with respect to freight costs, rent, cooperative advertising, computer and telecommunications costs, and occupancy costs, and travel advances, (C) claims or rights for refund or return of Taxes, (D) any litigation claims, rights, and causes of action, and (E) the security deposits under the Assigned Leases and other security deposits relating to any Assigned Contract;

(xi)   all rights of Seller to the telephone numbers used in the Business, including, but not limited to, the telephone numbers set forth on Schedule 1.01(a)(xi) annexed hereto;

(xii)   any accounts of Seller necessary for the operation of the Business;

(xiii)   without duplication, any asset listed on Exhibit C annexed hereto;

(xiv)   all cash generated by the operation of the Business or received by the Business on and after the Closing Date;

(xv)   all goodwill associated with the Purchased Assets and the Business; and

(xvi)   other than the categories of assets enumerated in subsections (i) through (xv) of this Section 1.01(a), all other assets of Seller of every kind and description, tangible or intangible, other than the Excluded Assets.

Notwithstanding the foregoing and for the avoidance of doubt, the transfer of the Purchased Assets pursuant to this Agreement shall not include the assumption of any Liability related to the Purchased Assets or the Business unless Buyer expressly assumes any such Liability pursuant to Section 1.01(d) of this Agreement.

(b)  Excluded Assets.  Notwithstanding the foregoing, Seller is not selling and Buyer is not purchasing pursuant to this Agreement, and the Purchased Assets shall not include, any assets specifically listed in this Section 1.01(b) (collectively, the "Excluded Assets"), *provided*, *however,* that (i) at any time prior to the entry of the Procedures Order, or (ii) within fifteen (15) Business Days after the date of the entry of the Procedures Order, Buyer may, by written notification to Seller, provide to Seller a Schedule 1.01(b) which specifically lists certain additional assets (other than Assigned Contracts which are exclusively addressed in Section 7.03 of this Agreement) to be excluded from purchase hereunder, which Schedule 1.01(b) shall be deemed to the extent necessary to amend such other Schedules or Sections hereof that may have listed such assets as Purchased Assets, and such assets shall become Excluded Assets, *provided*, *further*, *however*, that in no event will the Purchase Price be reduced with respect to any such deletions or exclusions, nor shall any such deletions or exclusions, individually or in the aggregate, give Buyer a right to terminate this Agreement or not close the transaction contemplated hereby.  The Excluded Assets shall include and consist solely of the following:

(i)  the Purchase Price;

(ii)  the assets listed on Exhibit D annexed hereto;

(iii)  all avoidance actions arising under chapter 5 of the Bankruptcy Code and all proceeds thereof;

(iv)  all of Seller's capital stock;

(v)  the Excluded Confidential Information;

(vi)  any cash, cash equivalents, securities and investments owned or held by of Seller, including, but not limited to, any and all cash, checks, money orders, wire transfers or other deposits and all deposit and securities accounts other than (1) any items purchased by Buyer under Section 1.01(a)(x) of this Agreement, including, but not limited to, the security deposits under the Assigned Leases and (2) all cash purchased pursuant under Section (a)(xiv) of this Agreement.

(vii)  insurance policies and insurance Contracts, coverage, and claims owned by or payable to Seller, and any proceeds therefrom, reserves thereunder, and other rights with respect thereto;

(viii)  any assets of any "employee benefit plan" held or administered by Seller (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended), and any rights under any such plan or any Contract, agreement, or arrangement between any employee or consultant and Seller; and

(ix) all Contracts other than the Assigned Contracts.

(c) <u>Method of Conveyance</u>. The sale, transfer, conveyance, assignment and delivery by Seller of the Purchased Assets to Buyer in accordance with <u>Section 1.01(a)</u> hereof shall be effected on the Closing Date by Seller's execution and delivery to Buyer of (i) a bill of sale and assignment to transfer title to Buyer of the Purchased Assets and (ii) such other duly executed assignments and other conveyance instruments with respect to Seller's transfer of intangible and Intellectual Property rights, real property interests and other Purchased Assets as shall be reasonably necessary to be delivered by Seller to effectuate the purchase and sale of the Purchased Assets as contemplated by the terms hereof, in each case in form reasonably acceptable to Buyer (collectively, the "<u>Conveyance Documents</u>").

(d) <u>Assumed Obligations</u>. Subject to the terms and conditions of this Agreement, at and as of the Closing Date, Buyer shall assume and agree to pay, discharge and satisfy when due in accordance with their terms, or upon such terms as may be agreed between Buyer and the counter-party thereto, the following Liabilities (collectively, the "<u>Assumed Obligations</u>"):

(i) the Liabilities under the Assigned Contracts accruing, arising out of, or to be performed during periods from and after the Closing Date; and

(ii) those Liabilities and obligations of Seller, expressly identified on <u>Exhibit F</u> annexed hereto, not to exceed one hundred and twenty-five thousand dollars ($125,000) in the aggregate; provided that: (i) such obligation has arisen in the ordinary course of the Seller's business not more than thirty (30) days before the Closing Date; (ii) the obligation has not yet become due; and (iii) the services rendered and/or goods provided by such vendor are identifiable and have been received by the Seller as of the Closing Date, or will be received by the Buyer after the Closing Date.

(e) <u>Excluded Liabilities</u>. Except for the Assumed Obligations, Buyer shall not assume, and shall have no responsibility for, any other Liabilities of Seller, as an assignee, transferee, successor in interest or otherwise, including, without limitation (except to the extent expressly included in the Assumed Obligations):

(i) Liabilities associated with the Excluded Assets;

(ii) any obligation of Seller to any employee, consultant or other professional of Seller, any Liability with respect to or arising from any "employee benefit plan" of Seller (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended), including, accrued pre- and post-petition salaries, wages (and related withholdings and payroll Taxes) and vacation/PTO, business expense reimbursements, and other ordinary course employee expenses and Liabilities, including incentive, retention, severance and commission plans and further including pre- and post-petition health insurance, employee benefits and similar Liabilities, in each case accrued or incurred in the Ordinary Course of Business; any Liability of Seller with respect to the Worker Adjustment and Retraining Notification (WARN) Act; and any Liability with

respect to COBRA coverage for employees or consultants of Seller terminated prior to or as part of the consummation of the transactions set forth in this Agreement;

(iii)     Liabilities for costs or expenses incurred in connection with, or related to, the administration of the Bankruptcy Case, including without limitation, any accrued professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors retained in or related to the Bankruptcy Case;

(iv)     Liabilities under any warranty, indemnity or guaranty obligation of Seller arising from or relating to any acts or transactions prior to the Closing Date;

(v)     Liabilities of Seller arising under any and all Contracts (other than Assigned Contracts) at any time, and Liabilities of Seller arising under the Assigned Contracts which accrue, arise out of or are to be performed at any time or times up to (and including) the Closing Date;

(vi)     Liabilities of Seller in respect of any notes payable of Seller or any indebtedness of Seller under any credit or loan facilities;

(vii)     any accounts payable of Seller;

(viii)     Liabilities of Seller relating to subscription or other service fees that are unearned as of the Closing Date;

(ix)     Liabilities of Seller for customer rebates or other promotional allowances;

(x)     Liabilities of Seller relating to any Taxes, including without limitation, Liabilities of Seller for income, transfer, sales, use, and other Taxes arising in connection with the consummation of the transactions contemplated hereby (including any income Taxes arising because Seller is transferring the Purchased Assets) and Liabilities of Seller for the unpaid Taxes of any Person under Treasury Regulation §1.1502-6 (or any similar provision of state, local, or non-U.S. law), as a transferee or successor, by contract, or otherwise;

(xi)     Liabilities of Seller arising from any obligation of Seller to indemnify any Person;

(xii)     Liabilities of Seller relating to periods of time prior or subsequent to the Closing;

(xiii)     leasehold Liabilities associated with the Assigned Leases;

(xiv)     fines, penalties, and other costs of Seller in connection with litigation proceedings brought by Governmental Authorities against Seller in connection with acts or omissions of Seller;

(xv)     any Liabilities or obligations with respect to any litigation, or to the Knowledge of Seller, threatened litigation, or claim, obligation, damages, costs and expenses relating to or arising out of any acts or omissions of Seller or the Bankruptcy Estate or any use of any of the Purchased Assets prior to the Closing Date, whether arising under contract, tort, civil or criminal law or otherwise; and

(xvi)     all Liabilities of Seller or any of Seller's Affiliates arising out of, resulting from or relating to infringement, violation, misappropriation or other conflict in connection with the Intellectual Property or any third party's Intellectual Property, to the extent arising or related to any event occurring or state of facts existing on or prior to the Closing Date (all Liabilities and obligations set forth in subsections "(i)" through "(xvi)" hereinabove collectively, the "Excluded Liabilities").

1.02     Payment for Assets.     In addition to Buyer's assumption of the Assumed Obligations up to the aggregate of one hundred twenty-five thousand dollars ($125,000), as additional consideration for the Purchased Assets being acquired by Buyer hereunder, Buyer shall pay two million one thousand six hundred and sixteen dollars ($2,001,616) as follows:

(a)     pay to Seller, in the manner set forth in Section 2.03 of this Agreement, the amount of one million four hundred thousand dollars ($1,400,000) (the "Cash Portion"), payable by wire transfer of immediately available funds to the account or accounts designated by Seller; and

(b)     satisfy the requirements under Section 365 of the Bankruptcy Code to, among other things, cure the full amount of any and all financial defaults under the Yonkers Lease, in the amount of six hundred one thousand six hundred sixteen dollars ($601,616) (the "Yonkers Cure Payment") (the consideration described in subsection "a" and "b" above, together with the assumption of the Assumed Obligations, collectively, the "Purchase Price," which Purchase Price is two million one hundred twenty six thousand six hundred and sixteen dollars ($2,126,616) in the aggregate).

1.03     Tax and Related Matters.

(a)     Buyer shall prepare an allocation of the Purchase Price (and all other capitalized costs) among the Purchased Assets in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended (the "IRC") and the Treasury Regulations promulgated thereunder (and any similar provision of state, local, or foreign law, as appropriate), which allocation shall be binding upon Seller.  Buyer shall deliver such allocation to Seller within sixty (60) days following the Closing Date.  Buyer and Seller and their Affiliates shall report and file Tax Returns (including, but not limited to, Internal Revenue Service ("IRS") Form 8594) in all respects and for all purposes consistent with such allocation prepared by Buyer.  Seller shall timely and properly prepare, execute, file and deliver all such documents, forms and other information as Buyer may reasonably request to prepare such allocation. Seller shall not take any position (whether in audits, Tax Returns or otherwise) that is inconsistent with such allocation unless required to do so by applicable law.

(b)     Subject to the Sale Order, Seller will timely pay all sales, use, transfer, recording, documentary, registration or other such Taxes that may be imposed by reason of the sale, assignment, transfer and delivery of the Purchased Assets.  Seller will, at its own expense, timely file all Tax Returns required to be filed in connection with the payment of such Taxes.

## ARTICLE II. - CLOSING

2.01     Closing.  Subject to the conditions stated in Article VI of this Agreement, the closing of the transactions contemplated hereby (the "Closing") shall either occur remotely via the exchange of documents and signature pages or at the New York offices of Troutman Sanders LLP at 10:00 a.m. eastern time on the first (1st) Business Day that is ten (10) days following the date of the entry of the Sale Order (or sooner following the date of the entry of the Sale Order at the election of Buyer), or, if the conditions set forth in Section 6.02 of this Agreement have not been satisfied or waived on such date, on the second (2nd) Business Day after all such conditions shall have been satisfied or waived.  The date upon which the Closing occurs is hereinafter referred to as the "Closing Date".  Upon consummation of the Closing, Buyer will receive the benefits of the Purchased Assets and accrue the obligations of the Assumed Obligations (including with respect to the Assigned Contracts) from and after 12:01 a.m. eastern time on the Closing Date, and as of such time, the risk of loss of the Purchased Assets shall be deemed transferred from Seller to Buyer.

2.02     Deliveries by Seller.  At or prior to the Closing, Seller shall deliver to Buyer:

(a)     the Conveyance Documents;

(b)     full title, possession and control of the Purchased Assets, free and clear of any and all Liens other than Assumed Obligations, pursuant to the Sale Order or otherwise;

(c)     a certificate executed by Seller to the effect that the conditions set forth in Section 6.02(a) of this Agreement have been satisfied;

(d)     all consents referred to on Schedule 2.02(d) annexed hereto;

(e)     a non-foreign affidavit dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the IRC stating that Seller is not a ''foreign person'' as defined in Section 1445 of the IRC;

(f)     (i) copies of resolutions of the board of directors and the shareholders of Seller authorizing and approving the transaction, this Agreement, the Conveyance Documents, the Collateral Agreements and all other agreements contemplated hereby and all of the transactions and agreements contemplated hereby and thereby; (ii) the certificate of incorporation, as amended, and bylaws, as amended, of the Company; and (iii) the names of the officer or officers of the Company authorized to execute this Agreement, and any and all documents, agreements and instruments contemplated herein, all certified by any authorized representative of the Company, to be true, correct, complete and in full force and effect and unmodified as of the Closing Date;

(g)     a good standing certificate with respect to Seller from the Secretary of State of the State of New York;

(h)     the Records; *provided*, *however*, that Seller may make and retain copies of any such Records for administrative, business, or legal purposes; and

(i)     such other documents as may be requested by Buyer's counsel to consummate the transaction contemplated hereby.

2.03     <u>Deliveries by Buyer</u>.  At or prior to the Closing, Buyer shall deliver to Seller:

(a)     the Cash Portion of the Purchase Price paid as follows:  (i) upon the execution of this Agreement, a deposit (the "Deposit") in the amount of two hundred thousand dollars ($200,000), to be held in an interest bearing escrow account by the Seller's attorney and to be released to Seller at Closing (unless it is to be returned to the Buyer pursuant to the provisions of the Sale Motion); and (ii) at the Closing, the balance, in the amount of one million two hundred thousand dollars ($1,200,000), of the Cash Portion of the Purchase Price;

(b)     an acknowledgement from Hampshire that the Buyer has either satisfied the Yonkers Cure Payment or made satisfactory arrangements with Hampshire for the payment of same; and

(c)     a certificate executed by an authorized officer of Buyer, on behalf of Buyer, to the effect that the conditions set forth in <u>Section 6.01(a)</u> of this Agreement have been satisfied.

2.04     <u>Termination in Absence of Closing</u>.

(a)     <u>Termination</u>.   This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing Date:

(i)     by mutual written consent of Seller and Buyer;

(ii)     by Buyer, if on or before March 21, 2011, the Closing has not occurred;  *provided, however*, that Buyer is not in default of its obligations hereunder;

(iii)     by Seller, if there has been a material breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in <u>Section 6.01</u> of this Agreement, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within ten (10) Business Days after written notice thereof shall have been received by Buyer;

(iv)     by Buyer, if there has been a breach by Seller of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in <u>Section 6.02</u> of this Agreement, and such breach shall be incapable of being cured or, if

capable of being cured, shall not have been cured within ten (10) Business Days after written notice thereof shall have been received by Seller;

(v)     by Buyer, on or before 11:59 p.m. eastern time on February 23, 2011, if Buyer, in its sole and absolute discretion, gives written notice to Seller that Buyer has determined it is not satisfied with its due diligence findings with respect to Seller (including, without limitation, all information provided by Seller on the Schedules attached hereto or any Schedule that is added, supplemented or amended pursuant to Section 5.05 of this Agreement)**;**

(vi)     by Buyer, at any time after January 24, 2011, if the Procedures Order shall not have been entered by such date;

(vii)     by Buyer, at any time after February 28, 2011, if the Sale Order approving and authorizing the sale and transfer of the Purchased Assets to Buyer shall not have been entered by such date; or

(viii)     by either Seller or Buyer, if there shall be any law or regulation that makes consummation of the purchase and sale transaction contemplated by this Agreement illegal or otherwise prohibited or if any judgment, injunction, order or decree permanently restraining, prohibiting or enjoining Buyer or Seller from consummating such transaction is entered, and such judgment, injunction, order or decree shall become final and unappealable.

(b)     Notice of Termination.  In the event of any termination pursuant to this Section 2.04, written notice thereof setting forth the reasons therefor shall promptly be given by the terminating Party to the other Party and the transactions contemplated by this Agreement shall be terminated, without further action by any Party.

(c)     Abandonment.   If this Agreement is terminated and the transactions contemplated hereby are abandoned as described in this Section 2.04, this Agreement shall become void and have no further force or effect, except for Section 2.04(d) of this Agreement. Notwithstanding the preceding sentence, nothing in this Section 2.04 shall be deemed to release any Party from any Liability for any breach by such Party of the terms and provisions of this Agreement or to impair the right of any Party to compel specific performance by any other Party of its obligations under this Agreement.

(d)     Break-up Fee.   Notwithstanding anything in this Agreement to the contrary: (1) in the event of a termination of this Agreement pursuant to subsections "(ii)", "(iv)", or "(vii)" of this Section 2.04(a), Seller shall promptly pay to Buyer the Stalking Horse Protections in the amounts set forth in paragraph "(2)" of Exhibit H annexed hereto; and (2) in the event of a termination of this Agreement pursuant to subsections "(ii)", "(iv)","(v)", "(vii)" or "(viii)" of this Section 2.04(a), and in the case of said subsections "(vii)" and "(viii)", not due to the sole fault of Buyer, or if Buyer determines that there has been a Material Adverse Change pursuant to Section 6.02(g) and decides not to consummate the transaction, Seller shall promptly

pay to Buyer the Expense Reimbursement in the amounts set forth in paragraph "(2)" of Exhibit H annexed hereto.

## ARTICLE III. - REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows:

3.01    Organization, Standing and Qualification.  Seller is a corporation duly organized, validly existing and in good standing under the laws of New York.  Seller has full corporate power and authority necessary to enable it to own, lease or otherwise hold its properties and assets and to carry on its Business as presently conducted consistent with past practice.  Seller is in good standing and duly qualified to do business in each jurisdiction in which the nature of the Business or the ownership, leasing or holding of its assets makes such qualification necessary. A list of the jurisdictions in which Seller is so qualified is set forth on Schedule 3.01 annexed hereto.

3.02    Power and Authority.  Subject to the issuance and entry of the Sale Order, Seller has full right, power and authority to enter into this Agreement and the Collateral Agreements and to perform its obligations hereunder and thereunder.  All corporate acts and other proceedings required to be taken by Seller to authorize the execution, delivery and performance of this Agreement and the Collateral Agreements and the consummation of the transactions contemplated hereby and thereby have been duly and properly taken.  This Agreement and the Collateral Agreements have been duly and validly executed and delivered by Seller and constitute a legal, valid and binding obligation of such Party, enforceable in accordance with its terms.  Except as set forth on Schedule 3.02 annexed hereto, no consent of any lender, trustee, security holder or any other Person is required to be obtained by Seller in connection with the execution, delivery and performance of this Agreement or the Collateral Agreements by Seller and the consummation of the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement and the Collateral Agreements by Seller:  (i) does not violate or constitute an actionable breach of or default under any Contract to which Seller is a party, under which it is obligated or to which it or any of the Purchased Assets are subject; (ii) does not violate any Legal Requirement to which Seller or the Purchased Assets is subject, or the certificate of incorporation or by-laws of Seller; and (iii) shall not result in the creation of any Lien on any of the Purchased Assets.  No consent, approval, license, permit, or authorization of, or registration, declaration or filing with, any Governmental Authority or any other third party is required to be obtained or made by or with respect to Seller in connection with the execution and delivery of this Agreement or the Collateral Agreements or the consummation by Seller of the transactions contemplated hereby and thereby.

3.03    Financial Statements.  Annexed hereto as Schedule 3.03 are true and correct copies of the following (collectively, the "Financial Statements"):  (i) an unaudited balance sheet of Seller at year end for the past three (3) years, and unaudited statements of operations, stockholders' equity and cash flows for such periods, and (ii) a balance sheet of Seller as of December 1, 2010, and statements of operations, stockholders' equity and cash flows for the one (1) month period ended on December 1, 2010, which financial statements are unaudited and were prepared by management of Seller in the Ordinary Course of Business.  The Financial Statements

fairly present, in all material respects, the financial condition of Seller at the dates thereof and the results of operations of Seller for the fiscal periods reported upon thereon, and were prepared in accordance with GAAP in a manner consistent with past practices in respect of Seller except for the lack of notes relating to the stub period. Seller shall provide in a timely manner all financial information requested by Buyer which Buyer deems necessary, in its reasonable discretion, in connection with the preparation of its financial statements and supplemental information with respect thereto for GAAP and regulatory purposes.

3.04    Title to Assets; Liens and Encumbrances.

(a)    On the Closing Date, Seller shall have good and marketable title to and be the sole owner of (or have valid and enforceable leases for) all of the Purchased Assets. At the Closing, Buyer shall acquire all the Purchased Assets free and clear of any and all Liens.

(b)    No assets relating to the Business have been disposed of since the Petition Date, except in the Ordinary Course of Business. Schedule 3.04(b) annexed hereto sets forth the locations of all of the equipment, furniture, fixtures and other tangible personal property and leasehold improvements of Seller relating to the Purchased Assets. All of such tangible personal property (other than the Inventories which are addressed in Section 3.16 hereof) are being sold in good working condition, reasonable wear and tear excepted. Any leased personal property included in the Purchased Assets is in all material respects in the condition required of such property by the terms of the leases applicable thereto.

3.05    No Subsidiaries.    Seller owns no stock or other equity interest, directly or indirectly, in any corporation, partnership, joint venture, trust, Subsidiary or other entity involved in the Business.

3.06    Contracts and Commitments.    Except as set forth in Schedule 3.06 annexed hereto, Seller is not a party to any oral or written (i) lease or license agreement or arrangement; (ii) agreement with any vendor or other supplier; (iii) royalty, distribution, agency, territorial or license agreement; (iv) Contract (for employment or otherwise) with any officer, employee, director, professional person or firm, independent contractor or advertising firm or agency which is not terminable at will by Seller on not more than thirty (30) days notice without payment or other penalty; (v) Contract or collective bargaining agreement with any labor union or representative of employees; (vi) Contract guaranteeing the payment or performance of the obligations of any other Person; or (vii) material Contract not made in the Ordinary Course of Business. Except as set forth on Schedule 3.06 annexed hereto, there are no oral understandings, arrangements or agreements to which Seller is bound or which modify any of the Assigned Contracts, except to the extent such understandings, arrangements or agreements do not have a material adverse effect on such Assigned Contracts or the Business. Each of the Assigned Contracts is a valid and subsisting Contract in full force and effect without modification and Seller has performed in all material respects all of its obligations thereunder, and each other party thereto has performed in all material respects all obligations required to be performed by it, and no default or event of default has occurred and is continuing thereunder. A true and complete copy of each Assigned Contract has been provided to Buyer.

3.07    Undisclosed Liabilities.   Seller has no Liabilities or obligations of any kind, whether accrued, absolute, secured or unsecured, contingent or otherwise, in connection with the Business, other than Liabilities that (i) are Excluded Liabilities, (ii) are set forth on Schedule 3.07 annexed hereto or (iii) arose in the Ordinary Course of Business, which Liabilities do not result from, arise out of, or relate to any breach or violation of, or default under, any obligation under a Contract or applicable Legal Requirement.

3.08    Compliance with Laws.   Seller has fully complied with, and is not in default under, any laws, regulations or orders applicable to the Purchased Assets or the Business except as to any state law that is otherwise preempted by federal law pursuant to the Bankruptcy Code and the authority of the Bankruptcy Court, except to the extent that any such noncompliance or default would not have an adverse effect on the Business.  Schedule 3.08 annexed hereto lists the material permits, licenses, consents and authorizations, whether federal, state, or local, held by Seller relating to the operation of the Business.

3.09    Litigation; Decrees.   Other than the Bankruptcy Case and other than as set forth on Schedule 3.09, there are no actions, suits, proceedings, investigations, administrative actions or complaints, warranty or indemnity claims or workers compensation claims of any nature pending (each a "Proceeding") (or, to the Knowledge of Seller, threatened) against Seller or affecting the Purchased Assets or Business or, to the Knowledge of Seller, any of Seller's officers, directors, employees, agents or Affiliates in their capacities as such in respect of the operation of Seller, in any court or before any Governmental Authority; and no Governmental Authority has at any time challenged or questioned the legal right of Seller to offer or sell any of its products in the present manner or style thereof.  There are no outstanding judgments, orders, consents, agreements or decrees with, of or by any Governmental Authority against Seller relating to the Business or the Purchased Assets.

3.10    Taxes.   Seller has timely filed all Tax Returns that it was required to file. All such Tax Returns were correct and complete in all respects and were prepared in compliance with all applicable laws and regulations.  All Taxes owed by Seller (whether or not shown or required to be shown on any Tax Return) have been paid.  Seller has withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party, and all IRS Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed. There are no Liens on any of the assets of Seller that arose in connection with any failure (or alleged failure) to pay any Tax.

3.11    Insurance.   All premiums on all insurance policies held by Seller have been paid in full, and a list of all such policies is set forth on Schedule 3.11 annexed hereto; all such policies are "occurrence", and none are "claims made," policies.  From the date hereof until the Closing, such insurance shall be maintained in full force and effect.

3.12    No Material Adverse Changes.   Since December 1, 2010, there has not been: (i) any Material Adverse Change in the financial condition, assets, Liabilities, Business or results of operations of Seller; (ii) any damage, destruction or loss, whether or not covered by insurance, materially and adversely affecting the Purchased Assets in the aggregate; (iii) except in the

Ordinary Course of Business: (A) any increase in the rate of compensation or commission payable or to become payable to any employee of the Business, distributor, commission salesman or agent, or (B) or any payment of any bonus, profit sharing or other extraordinary compensation to any employee of the Business, except pursuant to Contract; (iv) any material change in the accounting methods or practices followed by Seller or any material change in amortization policies or rates theretofore applied; (v) any sale, lease, abandonment or other disposition of any material asset of Seller (other than in the Ordinary Course of Business); or (vi) any cancellation of the debts owed to or claims held by Seller, except in the Ordinary Course of Business.

3.13    Employees.    Except for any wages, salaries, bonuses, profit sharing or other extraordinary compensation amounts which may have accrued prior to the Petition Date and which remain unpaid, Seller has no outstanding Liability for payment of wages, salaries, bonuses, profit sharing or other extraordinary compensation amounts, based upon or accruing with respect to those services of the employees of the Business performed prior to the date of this Agreement, except for any payments due for the current payment period or not yet due and payable. Schedule 3.13 annexed hereto contains a true, complete and accurate list of the names, titles, whether full-time or part-time, locations, and current salary for all the employees of the Business. Complete and correct copies of all personnel files in respect of the employees of the Business have been provided to Buyer for its inspection prior to the date hereof, and complete and correct copies of all personnel files, including without limitation a list of the current year's taxable wages for each employee of the Business, employment applications and I-9 forms shall be provided to Buyer at Closing ("Personnel Files"), except that in order to facilitate the transition from Seller to Buyer, Seller shall provide to Buyer, by no later than January 31, 2011, master payroll and related records including ADP tapes. Except as set forth in Schedule 3.13 annexed hereto, there is no, and during the past two (2) years there has been no, (i) labor strike, picketing, dispute, slow-down, work stoppage, union organization effort, grievance filing or proceeding or other labor difficulty actually pending or, to the Knowledge of Seller, threatened against or involving Seller, (ii) workers compensation claim or action against or involving Seller or (iii) United States Equal Employment Opportunity Commission, or similar agency, claim or action against or involving Seller. Seller is in full compliance with its obligations, if any, pursuant to the Worker Adjustment and Retraining Notification Act of 1988 ("WARN") and all other obligations arising under any other law, rule or regulation relating to the termination of employees, except to the extent that any such non-compliance would not have a Material Adverse Change on the Business. Seller has not taken and shall not take any action which could be reasonably expected to result in a "plant closing" or "mass layoff" (as those terms are defined in WARN) with respect to the operations or Business prior to the Closing Date. Seller has not been informed by any of the employees of the Business that such employee intends to terminate his or her employment with Seller prior to the Closing or would not be willing to work for Buyer thereafter. Seller shall timely provide to all employees of the Business a Form W-2 wage and Tax statement, and such other documents as may be required by applicable taxing authorities, for the applicable period ending on the Closing Date.

3.14    Benefit Plans.    Schedule 3.14 annexed hereto lists all group health or life insurance, death benefits, pension, severance, profit sharing, retirement, supplemental unemployment, disability, medical, dental, vision, employee assistance, retiree health care and insurance, bonus, extraordinary compensation, incentive, stock option or purchase or other

benefit plans, arrangements and practices maintained for or on behalf of the employees of the Business, including plans qualified under Section 401 of the IRC, as amended (including pension, savings and profit sharing plans and employee stock ownership plans), excess benefit plans, deferred compensation arrangements, employee discounts and matching gift programs. Seller has provided to Buyer copies of all summary plan descriptions provided to the employees of the Business, with respect to all plans referred to in Schedule 3.14 annexed hereto.

3.15    Return Policies; Warranties; Customer Special Orders.  Except as set forth on Schedule 3.15(i) annexed hereto, (i) Seller has made no warranties or guaranties relating to merchandise sold by or through the Business and has no separate return policy, and (ii) there are no deferred sales plans or similar arrangements with respect to the Business.  Schedule 3.15(ii) annexed hereto sets forth a listing of the value of all credits outstanding and relating to the Business as of the date hereof.

3.16    Inventories.  The Inventories included in the Purchased Assets have been acquired in the Ordinary Course of Business, in customary quantities for a purchaser of similar size to Seller and at prevailing prices, are of merchantable quality, and are usable and saleable in the Ordinary Course of Business.  Each item in the Inventories was purchased at a price at which a purchaser of similar size to Seller could have purchased such item in the Ordinary Course of Business at a fair market price.  No Inventories shall be damaged.  For purposes hereof, merchandise shall be deemed "damaged" if not saleable at the normal and usual Ordinary Course of Business.  All of the Inventories of Seller are fairly reflected in the inventory accounts on the balance sheet included in the Financial Statements and are valued at the retail-inventory method, all in accordance with GAAP.  Seller shall have paid in full all obligations which have arose subsequent to the Petition Date to all vendors by the Closing Date. Seller has provided to Buyer a list setting forth all merchandise "on order" with respect to the Business ("On Order List") as of the date of this Agreement and as set forth on Schedule 3.16.  From and after the date hereof, Buyer shall review all plans in respect of Inventory to be ordered and Seller shall update the On Order List periodically at Buyer's request.

3.17    Capital Expenditure Commitments.  Set forth on Schedule 3.17 annexed hereto is a list and summary of (i) all expenditures and other costs incurred prior to the date hereof and to be paid after the date hereof for the acquisition, maintenance, renovation or repair of fixed or capital assets of the Business and (ii) all expenditures and other costs which Seller reasonably believes may be required to be incurred after the date hereof for the acquisition, maintenance, renovation or repair of fixed or capital assets in connection with the operation of the Business. Seller has provided to Buyer true and correct copies of all related plans, drawings and expense agreements (if any) in respect thereof.  Schedule 3.17 annexed hereto also includes a list and summary of all items of fixed or capital assets for which amounts are included in Seller's books and records but as to which Seller has not paid the applicable third party.

3.18    Real Property.  Seller does not own any real property.  All real property leased for a period greater than one (1) month by Seller is listed on Schedule 3.18(i) annexed hereto (collectively, the "Leased Real Property").  Seller (i) has a valid and enforceable leasehold interest with respect to each item of Leased Real Property leased by it, subject to no Liens, and (ii) is in possession of and has quiet enjoyment of each item of Leased Real Property leased by it.

Except as described on Schedule 3.18(ii) annexed hereto, none of the Leased Real Property is subject to any sublease of all or any portion thereof and no Person other than Seller has any right to occupy any of the Leased Real Property. Seller does not pay any real estate Taxes on the Leased Real Property except as additional rent under the terms of the lease. The Leased Real Property is adequate for the current needs of Seller. All of the leasehold improvements at the Leased Real Property are adequate for the current needs of Seller and are in good condition. Except as described on Schedule 3.18(iii) annexed hereto, to the Knowledge of Seller, there is no pending, proposed, anticipated or contemplated, annexation, condemnation, eminent domain or similar proceeding, or any zoning or Tax or assessment proceeding affecting, or that may affect, all or any portion of the Leased Real Property.

3.19    Intellectual Property.

(a)    Licensed Intellectual Property. Schedule 3.19(a) annexed hereto sets forth all Intellectual Property that is licensed to Seller by any Person and used or held for use in the conduct of the Business (the "Licensed Intellectual Property") and the names of the licensors of such Licensed Intellectual Property. Except as set forth in Schedule 3.19(a) annexed hereto, Seller has no obligation to compensate any Person for the license of any Licensed Intellectual Property. Except as set forth in Schedule 3.19(a) annexed hereto, Seller has not granted to any Person any license, option or other rights to use any of the Licensed Intellectual Property, whether or not requiring the payment of royalties. No license for any Licensed Intellectual Property will terminate by reason of the execution, delivery and performance of this Agreement or any Collateral Agreement or the consummation of the transactions contemplated hereby and thereby. Seller has such rights to use the Licensed Intellectual Property, free and clear of any and all Liens, as are necessary in the Ordinary Course of Business.

(b)    Owned Intellectual Property.

(i)    Schedule 3.19(b)(i) annexed hereto sets forth a list of all Intellectual Property owned by Seller and related to or used in the conduct of the Business (the "Owned Intellectual Property"), including the title, jurisdiction(s) in which each item was or is filed or registered, and the respective application number, filing date, registration number and date of registration. Schedule 3.19(b)(i) annexed hereto also separately lists all Intellectual Property, including "marks" used in connection with the Business that have not been registered or applied for registration.

(ii)    All Owned Intellectual Property is valid, subsisting and enforceable, and all necessary registration, maintenance and other filing fees due through the date hereof in connection with the Owned Intellectual Property have been timely paid. All necessary documents in connection with the Owned Intellectual Property have been timely filed with the relevant authorities in the United States or foreign jurisdictions, as the case may be, for the purposes of establishing and maintaining the Owned Intellectual Property. Seller has provided to Buyer or made available current, true and complete copies of all Owned Intellectual Property.

(iii)   There are no actions that are required to be taken by Seller within 180 days of the date hereof with respect to the Owned Intellectual Property, including the payment of any registration, maintenance or renewal fees or the filing of any response to the United States Patent and Trademark Office actions or foreign equivalents.

(iv)   The Owned Intellectual Property constitutes all the Intellectual Property used in or necessary to conduct the Business as currently conducted or contemplated to be conducted.

(v)   Schedule 3.19(b)(v) annexed hereto sets forth all Owned Intellectual Property that is licensed by Seller to any third party.

(c)   Except as set forth on Schedule 3.19(c) annexed hereto, no Person has asserted, or threatened to assert to Seller, any claims (i) contesting the right of Seller to use, exercise, sell, license, transfer or dispose of any Intellectual Property, or (ii) challenging the ownership, validity or enforceability of any Intellectual Property, including, but not limited to, the Owned Intellectual Property.  No Intellectual Property is subject to any outstanding order, judgment, decree, stipulation or agreement related to or restricting in any manner the licensing, assignment, transfer, use or conveyance thereof by Seller.  Seller has not received any opinion of counsel regarding any third party Patents that would be relevant to the Business.

(d)   The operation of the Business does not infringe or misappropriate any Intellectual Property of any third Person, violate any right to privacy or publicity of any third Person, violate any Legal Requirements or constitute unfair competition or trade practices under applicable Legal Requirements.  Seller has not received notice from any third Person that the operation of the Business as currently conducted by Seller infringes or misappropriates the Intellectual Property of any third Person, violates any right to privacy or publicity of any third Person, violates any Legal Requirements or constitutes unfair competition or trade practices under applicable Legal Requirements.

(e)   Except as set forth in Schedule 3.19(e) annexed hereto, Seller has not brought any Proceeding alleging (i) infringement of any Owned Intellectual Property, or (ii) breach of any Licensed Intellectual Property, and, to the Knowledge of Seller, there does no exist any fact which could reasonably form the basis of any such Proceeding, and, to the Knowledge of Seller, there does not exist any fact which could reasonably form the basis of any such Proceeding.  Seller has not entered into any agreement granting any third party the right to bring infringement actions with respect to, or otherwise to enforce rights with respect to, any Intellectual Property related to the Business.

(f)   Seller has taken reasonable steps to protect and preserve the proprietary nature of the Intellectual Property related to the Business and any and all confidential or proprietary information of Seller related to the Business.  Seller has complied in all respects with all applicable contractual and legal requirements pertaining to information privacy and security used in or arising from the Business. No written complaint relating to an improper use or disclosure of, or a breach in the security of, any such information has been made or, to the Knowledge of Seller, threatened against Seller in written notice received by Seller within the last

five (5) years. Seller has not permitted any Intellectual Property related to the Business or any confidential or proprietary information of Seller related to the Business to lapse or enter in the public domain.

(g)     The intellectual technology systems are sufficient in all material respects to operate the Business. The intellectual technology systems are free from any disabling codes, viruses or other software routines or hardware components that permit unauthorized access, disablement or erasure of business data or otherwise cause the intellectual technology Systems to be incapable of being used in the Business.

3.20     <u>Licenses</u>. <u>Schedule 3.20</u> annexed hereto contains a true and complete list of each license used in and material to the Business, Seller's assets or the operations of Seller. Prior to the execution of this Agreement, Seller has delivered or caused to be delivered to Buyer true and complete copies of all such licenses. Except as disclosed in <u>Schedule 3.20</u> annexed hereto: (i) Seller owns or validly holds all licenses that are material to the Business or to its operations or assets; (ii) each license listed on <u>Schedule 3.20</u> annexed hereto is valid, binding and in full force and effect; (iii) Seller is not, nor has it received any notice that it is, in default (or with the giving of notice or lapse of time or both, would be in default) under any such license; and (iv) Seller has not received any notice (whether written or oral) from a licensor under any license as to the termination or non-renewal of such license as a result of the consummation of the transactions contemplated by this Agreement.

3.21     <u>Purchased Assets Necessary to the Business</u>. The Purchased Assets include all of the properties, assets and rights which are used in, or are necessary to carry on, the Business as currently conducted.

3.22     <u>Absence of Environmental Liabilities</u>. Seller has complied with, and at all times prior to the Closing Date shall comply with, all applicable environmental laws, orders, regulations, rules and ordinances adopted, imposed or promulgated by any Governmental Authority relating to the Business. Seller is not in violation of any federal, state or local law, ordinance or regulation relating to industrial hygiene, worker safety, environmental hazardous materials or waste or toxic materials on, under or about any of the premises of the Business.

3.23     <u>Accounts Receivable</u>. All accounts receivable of Seller: (i) have arisen from bona fide transactions in the Ordinary Course of Business and are payable on ordinary trade terms, (ii) to the Knowledge of Seller, are legal, valid and binding obligations of the respective debtors enforceable in accordance with their terms, and (iii) are not subject to any valid set off or counterclaim. All accounts receivable of Seller are set forth on <u>Schedule 3.23</u> annexed hereto and are good and fully collectible at the aggregate recorded amounts thereof, net of any applicable reserve for returns or doubtful accounts reflected thereon.

3.24     <u>Brokers</u>. Except as set forth in <u>Schedule 3.24</u> annexed hereto, all negotiations relative to this Agreement and the transactions contemplated hereby have been carried out by Seller directly with Buyer without the intervention of any Person on behalf of Seller in such manner as to give rise to any valid claim by any Person against Buyer for a finder's fee, brokerage commission or similar payment.

3.25   Disclosure.  No third party intends to cease doing business with Seller or is aware of any adverse prospects in respect of the Business.  All material facts relating to Seller and the Business have been disclosed to Buyer in or in connection with this Agreement.  No representation or warranty contained in this Agreement, and no statement contained in the Schedules hereto or in any certificate, list or other writing furnished to Buyer pursuant to any provision of this Agreement (including, without limitation, the financial statements attached to Schedule 3.03 annexed hereto), contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements herein or therein, in the light of the circumstances under which they were made, not misleading.

3.26   Updates.  From the date hereof, until the Closing, Seller shall promptly notify Buyer by written update to its representations and warranties contained herein (including the Schedules hereto) of any matter occurring after the date hereof which, if existing or occurring on the date hereof would have been required to be set forth on a Schedule to this Agreement or which would render inaccurate any of the representations, warranties or statements of the Seller set forth in this Agreement (each, a "Supplement").  Upon Buyer's receipt of such Supplement, such representations and warranties shall be deemed to be automatically updated as set forth therein; *provided, however*, that no Supplement provided pursuant to this section shall be deemed to cure any breach of any representation, warranty or covenant in this Agreement existing as of the date hereof.

## ARTICLE IV. - REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

4.01   Organization and Standing.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York.

4.02   Authorization.  Buyer has full right, power and authority to enter into this Agreement and the Collateral Agreements and to perform its obligations hereunder and thereunder.  All corporate and other proceedings required to be taken by Buyer to authorize the execution, delivery and performance of this Agreement and the Collateral Agreements and the consummation of the transactions contemplated hereby have been duly and properly taken.  This Agreement and the Collateral Agreements have been duly and validly executed and delivered by Buyer and constitute a legal, valid and binding obligation of Buyer, enforceable in accordance with its terms (except as limited by bankruptcy, insolvency and other laws of general application relating to the enforcement of creditors' rights and by general equitable principles).  No consent of any lender, trustee, security holder or any other Person is required to be obtained by Buyer in connection with the execution, delivery and performance of this Agreement or the Collateral Agreements by Buyer and the consummation of the transaction contemplated hereby.  The execution, delivery and performance of this Agreement and the Collateral Agreements by Buyer: (i) does not violate or constitute a breach of or default under any Contract to which Buyer is a party, under which it is obligated or to which Buyer is subject; and (ii) does not violate any Legal Requirement to which Buyer is subject or the certificate of incorporation or by-laws of Buyer.  No consent, approval, license, permit or authorization of, or registration, declaration or filing with, any Governmental Authority or any third party is required to be obtained or made by or

with respect to Buyer in connection with the execution and delivery of this Agreement or the Collateral Agreements or the consummation by Buyer of the transactions contemplated hereby.

4.03    Brokers.    All negotiations relative to this Agreement and the transactions contemplated hereby have been carried out by Buyer directly with Seller without the intervention of any Person on behalf of Buyer in such manner as to give rise to any valid claim by any Person against Seller for a finder's fee, brokerage commission or similar payment.

## ARTICLE V. - OBLIGATIONS PRIOR TO CLOSING

From the date of this Agreement through the Closing:

5.01    Buyer's Access to Information and Properties.    Seller shall permit Buyer and its authorized employees, agents, accountants, legal counsel and other representatives to have full access upon written request during normal business hours of Seller to the books, records, employees, counsel, accountants, engineers and other representatives of Seller as reasonably requested by Buyer for the purpose of fulfilling its obligations hereunder and consummating the transaction contemplated hereby.    Seller shall make available to Buyer upon written request during normal business hours for examination and reproduction (or electronically) copies of all documents and data of every kind and character relating to the Business in possession or control of, or subject to reasonable access by, Seller, including, without limitation, all files, records, data and information, relating to the Business and the Purchased Assets (whether stored in paper, magnetic or other storage media) and all instruments, Contracts, assignments, certificates, orders, and amendments thereto.    Also, Seller shall during normal business hours allow Buyer upon written request full access to, and the right to inspect, the Business and the Purchased Assets. Notwithstanding anything to the contrary in this Section 5.01, Seller shall not be required to grant Buyer access (i) to any Excluded Confidential Information, (ii) to any other confidential information relating exclusively to Excluded Assets and/or Excluded Liabilities or (iii) as prohibited by any Legal Requirement.

5.02    Seller's Conduct of Business and Operations.    Seller shall keep Buyer reasonably advised, to the extent permitted by Legal Requirements, as to all changes to material operations and proposed material operations relating to the Purchased Assets.    Seller shall comply in all material respects with the terms, provisions and conditions of the Bankruptcy Code.    Except (i) as otherwise contemplated in this Agreement and (ii) for the termination of employment of any or all Employees of Seller other than the Hired Employees, Seller will:

(a)    conduct the Business in the Ordinary Course of Business;

(b)    use its best efforts to preserve the relationships of Seller existing as of the date hereof with Persons having significant business relations with Seller with respect to the Business or the Purchased Assets;

(c)    maintain and operate the Purchased Assets in the Ordinary Course of Business and repair and continue normal maintenance, normal wear and tear expected;

(d)     continue to operate the Business in all material respects in compliance with all Laws applicable to Seller or the Business;

(e)     continue to (I) conduct the Business, (II) operate the billing and collection policies and procedures with respect to the Business, (III) maintain the books and records of the Business in the Ordinary Course of Business and (IV) maintain the employees of Seller as set forth on Schedule 3.13;

(f)     not sell, lease transfer, mortgage, encumber, alienate or dispose of the Purchased Assets;

(g)     not institute new methods of accounting that will vary materially from the methods used by Seller as of the date of this Agreement except as may be required by GAAP;

(h)     not enter into any Contract or purchase order not in the Ordinary Course of Business;

(i)     not sell Inventory other than in the Ordinary Course of Business; and

(j)     not take any action inconsistent with this Agreement or with the consummation of the Closing.

5.03     <u>Notification of Certain Matters</u>.  Prior to the Closing Date: (i) Seller shall give prompt notice (and in no event shall such notice be later than 1 business day from the date of occurrence of such matter requiring notice) to Buyer, of (a) any representation or warranty made by Seller contained in this Agreement becoming materially untrue or inaccurate or any failure of Seller to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it under this Agreement or (b) of the occurrence of any event that has had, or is reasonably expected to have, a Material Adverse Change; and (ii) Buyer shall give prompt notice to Seller of any representation or warranty made by Buyer contained in this Agreement becoming materially untrue or inaccurate or any failure of Buyer to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it under this Agreement.

5.04     <u>Employee Cooperation</u>.  Buyer, in consultation with Seller, shall determine those employees of Seller employed in connection with the Business to whom Buyer will offer employment prior to or at the Closing, and shall provide Seller one or more lists collectively setting forth all such employees (the "<u>Selected Employees</u>").  Seller shall not take any action, directly or indirectly, to prevent or discourage any employee previously so identified to Seller by Buyer as a Selected Employee from accepting employment with Buyer, provided that Seller may offer Selected Employees part time employment as consultants in connection with the wind down of Sellers' operations, and Buyer shall reasonably cooperate in accommodating such Selected Employees' consultation.  Seller shall provide Buyer with access to communicate with the employees of Seller prior from the date hereof through the Closing.

5.05     <u>Addition, Supplementation and Amendment of Schedules</u>.  As of the date of execution of this Agreement, the Schedules of Seller are incomplete and not final.  By January

31, 2011 at 11:59 p.m. EST, Seller shall provide Buyer complete and final Schedules related to Seller's representations and warranties set forth in Article III which will be viewed by Buyer as part of its due diligence investigation so that Buyer may terminate this Agreement pursuant to Section 2.04(a)(v) if Buyer, its sole and absolute discretion, is not satisfied with the disclosures provided in such Schedules.

5.06   Transitional Access.  Notwithstanding anything to the contrary in this Agreement, for a period of ten (10) days following the Closing Date, any and all of the Excluded Assets may be removed from the Assumed Facilities by Seller (at no expense to Buyer).  Seller shall remove the Excluded Assets in a manner that does not disrupt normal business activities at the Assumed Facilities.

## ARTICLE VI. - CONDITIONS TO SELLER'S AND BUYER'S OBLIGATIONS

6.01   Conditions to Obligations of Seller.  The obligations of Seller to consummate the transactions contemplated by this Agreement are subject, at the option of Seller, to the satisfaction, or waiver by Seller, of the following conditions:

(a)      All representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects at and as of the Closing, except to the extent that such representations and warranties are qualified by terms such as "material", in which case such representations and warranties shall be true and correct in all respects at and as of the Closing, the and Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing, except to the extent that such covenants are qualified by terms such as "material", in which case Buyer shall have performed and complied with all of such covenants in all respects through the Closing.

(b)      Buyer shall have furnished Seller with a certified copy of all necessary corporate action on its behalf approving its execution, delivery and performance of this Agreement.

(c)      As of the Closing Date, no suit, action or other proceeding (excluding any such matter initiated by or on behalf of Seller or any stockholder of Seller) shall be pending or threatened before any Governmental Authority seeking to restrain Seller with respect to the transaction contemplated hereby or prohibit the Closing.

(d)      Buyer shall have delivered at Closing all documents required to be delivered by Buyer pursuant to Section 2.03 hereof.

(e)      The Sale Order shall have been entered by the Bankruptcy Court by February 28, 2011, shall be in compliance in all material respects with any applicable requirements with respect thereto pursuant to Article VII hereof, and shall be final and non-appealable.

6.02    <u>Conditions to Obligations of Buyer</u>.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject, at the option of Buyer, to the satisfaction, or waiver by Buyer, of the following conditions:

(a)    All representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects at and as of the Closing, except to the extent that such representations and warranties are qualified by terms such as "material", in which case such representations and warranties shall be true and correct in all respects at and as of the Closing, the and Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing, except to the extent that such covenants are qualified by terms such as "material", in which case Seller shall have performed and complied with all of such covenants in all respects through the Closing.

(b)    Seller shall have furnished Buyer with a certified copy of all necessary corporate action on its behalf approving its execution, delivery and performance of this Agreement.

(c)    As of the Closing Date, no suit, action or other proceeding (excluding any such matter initiated by or on behalf of Buyer) shall be pending or threatened before any Governmental Authority seeking to restrain Buyer with respect to the transaction contemplated hereby or prohibit the Closing.

(d)    All corporate proceedings to be taken by Seller in connection with the transactions contemplated hereby and all documents incident thereto shall be reasonably satisfactory in form and substance to Buyer and its counsel, and Buyer and said counsel shall have received all such counterpart originals or copies of such documents as it or they may reasonably request.

(e)    The Procedures Order shall have been entered by the Bankruptcy Court by January 24, 2011, shall be in compliance in all material respects with any applicable requirements with respect thereto pursuant to <u>Article VII</u> hereof, and shall be final and non-appealable.

(f)    The Sale Order shall have been entered by the Bankruptcy Court by February 28, 2011, shall be in compliance in all material respects with any applicable requirements with respect thereto pursuant to <u>Article VII</u> hereof, and shall be final and non-appealable.

(g)    There shall not have been a Material Adverse Change since the date of this Agreement.

(h)    Buyer shall have completed its legal due diligence investigation of Seller to its satisfaction, in its sole and absolute discretion.

(i)    Seller shall have delivered at Closing all documents required to be delivered by Seller pursuant to <u>Section 2.02</u> hereof.

(j)     Buyer shall have executed an employment agreement with Max Munn upon terms and conditions satisfactory to Buyer.

## ARTICLE VII. - BANKRUPTCY COURT APPROVAL

7.01    <u>Bankruptcy Approval Necessary</u>.    The approval of the Bankruptcy Court is required for the transactions contemplated by this Agreement to be implemented and enforceable. As soon as reasonably practicable but in no event more than two (2) Business Days following execution of the Agreement, Seller shall file with the Bankruptcy Court a motion for the approval of the sale procedures and break-up fee as outlined hereinbelow (the "<u>Procedures Motion</u>"), and for the approval of this Agreement (the "<u>Sale Motion</u>"), each in form and substance consistent with this Agreement.

(a)     <u>Procedures</u>.    The Procedures Motion shall seek entry of an order (the "<u>Procedures Order</u>"), in form and substance mutually and reasonably acceptable to the Parties, providing, in substance, for the bidding procedures listed on <u>Exhibit H</u> annexed hereto.

(b)     <u>Sale Order</u>.    The Sale Motion shall seek entry of an order (the "<u>Sale Order</u>"), in form and substance mutually and reasonably acceptable to Buyer and Seller, approving and authorizing this Agreement and the transactions contemplated hereby with Buyer and providing for all necessary and customary findings and holdings, including at minimum the following:

(i)     Seller has adequately marketed the Purchased Assets, and all interested parties, potential bidders and parties who hold Liens in the Purchased Assets have received proper and adequate notice of the sale in accordance with the Bankruptcy Code and applicable orders of the Bankruptcy Court, including the Procedures Order and any other related orders;

(ii)     Seller is authorized to consummate the transaction contemplated under this Agreement;

(iii)     the terms of this Agreement are fair and reasonable and provide fair value for the Purchased Assets, that Buyer's bid is the best offer for the Purchased Assets, and that the sale to Buyer is in the best interests of Seller and its creditors;

(iv)     the Purchased Assets shall be sold free and clear of any and all Liens, with such Liens, if any, to attach to the consideration to be received by Seller in the same priority and subject to the same defenses and avoidability, if any, as before the Closing, and Buyer would not enter into this Agreement or purchase the Purchased Assets otherwise;

(v)     the transfer of the Purchased Assets to Buyer will be a legal, valid and effective transfer of the Purchased Assets, and will vest Buyer with all right, title and interest of Seller to the Purchased Assets free and clear of any and all Liens, including any such Liens (A) that purport to give or transfer to any party any right, entitlement or ability to exercise ownership, joint ownership, control or similar interest whatsoever, or

to exercise, utilize or exploit any license, sub-license or similar interest whatsoever, over, in, relating to, regarding or with respect to any of the Purchased Assets, including without limitation any Intellectual Property, (B) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of Seller's or Buyer's interest in the Purchased Assets, or similar rights, or (C) relating to Taxes or any other Liabilities relating to the Purchased Assets, Seller, or the Business, other than the Assumed Obligations;

(vi)     Seller's assignment and Buyer's assumption of the Assigned Contracts is approved on the terms provided in this Agreement, and Buyer has provided adequate assurances of future performance thereunder;

(vii)     Buyer is a good faith buyer entitled to the protections afforded by Section 363(m) of the Bankruptcy Code such that the reversal or modification on appeal of the Sale Order shall not affect the validity of the sale of the Purchased Assets as contemplated hereunder, that negotiations have been fair and arms' length, and that no Party has engaged in any conduct that would cause the sale to be avoided under Section 363(n) of the Bankruptcy Code; and

(viii)     Buyer shall have no obligations with respect to any Liabilities of Seller other than the Assumed Obligations and its obligations under this Agreement and the Collateral Agreements.

7.02     <u>Waiver of Conditions</u>.  Seller may waive any or all of the conditions precedent in <u>Section 6.01</u> of this Agreement, and Buyer may waive any and all of the conditions precedent in <u>Section 6.02</u> of this Agreement by written notification to the other Party.

7.03     <u>Executory Contracts</u>.

(a)     Subject to the terms and conditions of this Agreement, and in reliance on the representations, warranties and covenants set forth in this Agreement and notwithstanding anything to the contrary in <u>Section 1.01</u> of this Agreement, Seller shall, pursuant to Section 365 of the Bankruptcy Code, assume and then sell, assign, transfer and convey to Buyer all Assigned Contracts.

(b)     Buyer shall be responsible for any and all monetary cures or other payments required under Section 365 of the Bankruptcy Code to assume and assign the Assigned Contracts to Buyer, and Seller shall be responsible for any non-monetary cures, to the extent non-monetary defaults are required by law to be cured, or other actions so required; *provided, however*, that in each case, Buyer shall be responsible for providing evidence as to the adequate assurance of future performance required under Section 365 of the Bankruptcy Code.  The Sale Order shall provide that the assumption and assignment to Buyer of the Assigned Contracts is approved, subject only to (i) payment of all cures or other payments or actions required to assume and assign the Assigned Contracts to Buyer and (ii) Buyer's right to exclude any Contract from the definition of Assigned Contracts in accordance with the terms of this <u>Section 7.03</u>.

(c)     Buyer shall have the right to designate any Contract that would otherwise be a Purchased Asset as an Excluded Asset by written notice to Seller at any time prior to the date that is thirty (30) days following the Closing Date or, if such date does not fall on a Business Day, the next succeeding Business Day (the "Contract Determination Date").  Such Contracts shall be deemed Excluded Assets for all purposes hereunder upon such notice to Seller.

(d)     In the event Buyer elects to exclude any Contracts from the Assigned Contracts in accordance with the preceding Section 7.03(c), then notwithstanding anything to the contrary herein, Buyer shall indemnify Seller and Seller's bankruptcy estate for all amounts that arise under each such Contract, if any, during the period from and including the Closing Date to the date such Contract is excluded from the Assigned Contracts.

(e)     If any non-debtor party to an executory Contract objects to the assumption and assignment of such Contract, and such party's consent is required under Section 365(c) of the Bankruptcy Code for the assumption and assignment of such executory contract to Buyer, Buyer agrees that such executory contract shall be deemed an Excluded Asset, unless such consent is obtained.

## ARTICLE VIII. - POST-CLOSING OBLIGATIONS

8.01    Employment.  Seller shall provide commercially reasonable cooperation and assistance to Buyer in transitioning Hired Employees to employment with Buyer.

8.02    Further Assurances.  Following the Closing, Seller and Buyer shall execute and deliver such documents, and take such other actions, as shall be reasonably requested by the other Party to consummate the transactions contemplated by this Agreement.  Following the Closing and upon reasonable notice, both Buyer and Seller shall provide any and all documentation relating to the Purchased Assets that is reasonably requested by each other.

8.03    Maintenance and Disposition of Records.  Buyer will preserve and maintain the Records for a period of two (2) years following the Closing Date.  After such two (2) year period, Buyer will provide at least sixty (60) days prior written notice to Seller, of its intent to dispose of any such Records, and Seller and its Affiliates will be given the opportunity, at their cost and expense, to remove and retain all or any part of such Records as they may select.

8.04    Name Change.  Seller agrees (i) to promptly, but in no event later than five (5) days after the Closing, change the name of Seller to some other name not including the words "APF", "Master Frameworkers" or "Munn" or any related logo or design (collectively, "APF Name"), (ii) to promptly, but in no event later than five (5) days after requested by Buyer sign any documents waiving any right to any name including the words "APF", "Master Frameworkers" or "Munn" or any other APF Name, and (iii) after the Closing not to use the current name of Seller or any name including the words "APF", "Master Frameworkers" or "Munn" or any other APF Name in any way (including without limitation any use as domain names) for the purpose of selling or marketing any product or service or otherwise or in any other way which in Buyer's reasonable judgment could be detrimental to Buyer's enjoyment of the rights and goodwill it sought when it paid for and acquired the Purchased Assets of Seller.

# ARTICLE IX. – INDEMNIFICATION

9.01    Survival.  The representations and warranties of Seller in this Agreement and the right by Buyer to assert a claim under this Article IX with respect to any such representations and warranties shall survive the Closing for a period of twenty-four (24) months, except that if written notice asserting any bona fide claim for indemnification under this Article IX shall have been given within the applicable survival period, the representations and warranties that are the subject of such claim shall survive until such claim is fully and finally resolved. The covenants and agreements contained in this Agreement to be performed or complied with after the Closing Date shall survive until fully performed or complied with. The right to indemnification, reimbursement or other remedy based upon the representations, warranties, covenants and obligations contained in this Agreement shall not be affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date with respect to the accuracy or inaccuracy of or compliance with any such representation or warranty, will not affect the right to indemnification, reimbursement or other remedy based upon such representations and warranties.

9.02    Seller's Agreement to Indemnify.  If the Closing occurs, subject to the terms of this Article IX, Seller hereby agrees that from and after the Closing it shall indemnify, defend and hold harmless Buyer, its Affiliates and their respective directors, officers, shareholders, partners, members, attorneys, accountants, agents, representatives and employees and their heirs, successors and permitted assigns, each in their capacity as such (the "Buyer Indemnified Parties") and in respect of Losses imposed on, sustained, incurred or suffered by, or asserted against, any of the Buyer Indemnified Parties (the "Buyer Damages"), whether in respect of third party claims, claims between the Parties hereto, or otherwise, subject to this Section 9.02, directly or indirectly relating to or arising from or in connection with:

(a)    any breach of, or any inaccuracy in any representation or warranty made by Seller contained in this Agreement, any Collateral Agreement or any other document delivered pursuant to this Agreement, it being understood that for purposes of this Section 9.02 any qualifications relating to materiality, including the term "Material Adverse Change", or relating to knowledge contained in such representation or warranty shall be disregarded for purposes of determining whether such representation or warranty was breached;

(b)    any breach by Seller (or failure by Seller to perform) any covenant, obligation or agreement of Seller contained in this Agreement, any Collateral Agreement or any document delivered pursuant to this Agreement including any Liability arising out of the ownership or operation of the Purchased Assets prior to the Closing other than the Assumed Obligations;

(c)    any of the Excluded Assets or the Excluded Liabilities; or

(d)    any Taxes and transfer Taxes for which Seller is responsible in accordance with Section 1.03 of this Agreement.

9.03    Limitations on Seller's Agreement to Indemnify.   The obligations of Seller to indemnify and hold harmless the Buyer Indemnified Parties pursuant to this Article IX are subject to the following limitations:

(a)    In calculating amounts payable to Buyer, the amount of any indemnified Buyer Damages shall be determined without duplication of any other Buyer Damages for which a claim by any Buyer Indemnified Party has been made.

(b)    Any written notice delivered by a Buyer Indemnified Party to Seller seeking indemnification pursuant to this Agreement with respect to Buyer Damages shall set forth with as much specificity as is reasonably practicable the basis of the claim for Buyer Damages, the sections of this Agreement which form the basis for the claim, copies of all written materials relating to such claim and, to the extent reasonably practicable, a reasonable estimate of the amount of the Buyer Damages that have been or may be sustained by the Buyer Indemnified Party.

(c)    Buyer shall use commercially reasonable efforts to make and pursue a timely claim for insurance and/or other payments available from third parties with respect to Losses for which it will seek indemnification hereunder.

(d)    The amount of any Losses for which indemnification is provided for under this Agreement shall be reduced by (i) any amounts actually realized by the indemnified party as a result of any indemnification, contribution or other payment by any third party and (ii) any insurance proceeds or other amounts actually realized by the indemnified party from third parties with respect to such Losses. The indemnified party shall pay the amount of any such proceeds or benefits described in this Section 9.03(c) to the indemnifying party within thirty (30) days of such proceeds or benefits being actually realized by the indemnified party.

## ARTICLE X. - MISCELLANEOUS

10.01    Prorations.   The Parties agree that financial responsibility for (i) all water, gas, electricity and other utilities, sewer, and other municipal charges, common area maintenance reimbursements to lessors, local business or other license fees, dues and other similar periodic charges and assessments (including such of the foregoing which have or may become a lien thereon, whether or not recorded, prior to the Closing Date) for which Buyer shall be responsible under the Assumed Facilities and other real property interests and interests in related improvements acquired by Buyer hereunder (whether by fee ownership or as the result of an Assigned Contract), and (ii) any real estate and personal property Taxes thereon or otherwise respect to the Purchased Assets that are due or become due without acceleration for any Straddle Period ((i) and (ii) collectively, the "Apportioned Obligations"), and any refund, rebate or similar payment received by Seller or Buyer for any Taxes that are Apportioned Obligations, will be apportioned between Seller and Buyer by dividing (A) the number of days in the applicable Straddle Period falling on or before the Closing Date and the number of days in the applicable Straddle Period falling after the Closing Date by (B) the total number of days in such Straddle Period, and multiplying the result by the total amount of such Apportioned Obligations for such Straddle Period.   Seller will be responsible for the amount apportioned to days on or before the

Closing Date and will pay any Apportioned Obligations which are due and payable prior to the Closing, and Buyer will be responsible for the amount apportioned to days after the Closing Date and will pay any Apportioned Obligations which are due and payable after the Closing. The Purchase Price shall be adjusted up or down as appropriate based on the amount of the Apportioned Obligations. The proration of the Apportioned Obligations made pursuant to this Section 10.01 shall be final and in no event shall Seller be responsible for any Apportioned Obligations attributable to any period after the Closing Date.

10.02 Confidentiality. The Parties acknowledge that Seller and Buyer have previously executed a confidentiality agreement dated January __, 2011 (the "Confidentiality Agreement"), which Confidentiality Agreement will continue in full force and effect in accordance with its terms (subject to any modification thereof that has occurred or may subsequently occur as a matter of Legal Requirement as a result of the Bankruptcy Case).

10.03 Costs and Expenses. Except as otherwise expressly provided in this Agreement, each of the Parties to this Agreement shall bear its own expenses incurred in connection with the negotiation, preparation, execution and closing of this Agreement and the transactions contemplated hereby. Without limiting the foregoing, each Party shall bear the expenses of any finder, broker, agent or other intermediary who acted for or on behalf of such Party in connection with the negotiation or consummation of the transactions contemplated hereby.

10.04 Notices. Any notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "notice") shall be in writing and delivered personally or mailed by registered or certified mail, postage prepaid and return receipt requested, or by facsimile, as follows:

|  |  |  |
|---|---|---|
| IF TO BUYER: | Name: | APF Management Company, LLC |
|  | Address: | 969 Midland Avenue |
|  |  | Yonkers, New York 10704 |
|  | Attn: | Gregory J. Petrillo, Co-Managing Member |
|  | Facsimile: | (914) 378-8889 |

with a copy to:

|  |  |  |
|---|---|---|
|  | Name: | Troutman Sanders LLP |
|  | Address: | 405 Lexington Avenue |
|  |  | New York, New York 10174 |
|  | Attn: | John P. Campo, Esq. |
|  | Facsimile: | (212) 704-5907 |

|  |  |  |
|---|---|---|
| IF TO SELLER: | Name: | APF Group, Inc. |
|  | Address: | 60 Fullerton Avenue |
|  |  | New York, New York 10704 |
|  | Attn: | Max Munn, President |
|  | Facsimile: | (914) 665-1610 |

with a copy to:

| | |
|---|---|
| Name: | Rattet, Pasternak & Gordon-Oliver, LLP |
| Address: | 550 Marmoneck Avenue |
| | Suite 510 |
| | Harrison, New York  10528 |
| Attn: | Jonathan S. Pasternak, Esq. |
| Facsimile: | (914) 381-7406 |

Each of the above addresses for notice purposes may be changed by providing appropriate notice hereunder.  Notice given by personal delivery or registered mail shall be effective upon actual receipt.  Notice given by facsimile shall be effective upon actual receipt if received during the recipient's normal business hours, or at the beginning of the recipient's next normal Business Day after receipt if not received during the recipient's normal business hours.  All notices by facsimile shall be confirmed by the sender thereof promptly after transmission in writing by registered mail or personal delivery.  Anything to the contrary contained herein notwithstanding, notices to any Party shall not be deemed effective with respect to such Party until such notice would, but for this sentence, be effective both as to such Party and as to all other Persons to whom copies are provided above to be given.

10.05  <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without reference to the choice of law principles thereof, that defer to or result in the application of the substantive laws of another jurisdiction.  Venue and jurisdiction for any legal action concerning this Agreement will be exclusively in the Bankruptcy Court.

10.06  <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement (including the Schedules and Exhibits annexed hereto) and all Collateral Agreements and the Confidentiality Agreement, constitutes the entire agreement between and among the Parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties, and there are no warranties, representations or other agreements between the Parties in connection with the subject matter hereof except as set forth specifically herein or contemplated hereby.  No supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the Party to be bound thereby.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (regardless of whether similar), nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided.

10.07  <u>Binding Effect and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns; but neither this Agreement nor any of the rights, benefits or obligations hereunder shall be assigned, by operation of law or otherwise, by any Party without the prior written consent of the other Party, *provided*, *however*, that nothing herein shall prohibit the assignment, whether prior to or after Closing, of all (but not less than all) of Buyer's rights and obligations to one or more direct or indirect

Subsidiaries or other Affiliates of Buyer (including a Subsidiary to be formed after the execution of this Agreement) or financing sources of Buyer; provided that notwithstanding any such assignment Buyer shall remain liable for all performance required of Buyer under this Agreement. Nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Parties and their respective permitted successors and assigns any rights, benefits or obligations hereunder.

10.08 <u>Remedies</u>. The rights and remedies provided by this Agreement are cumulative, and the use of any one right or remedy by any Party shall not preclude or constitute a waiver of its right to use any or all other remedies. Such rights and remedies are given in addition to any other rights and remedies a Party may have by law, statute or otherwise.

10.09 <u>Schedules</u>. The Schedules referred to herein are attached hereto and incorporated herein by this reference. Neither the listing nor description of any item, matter or document in any Schedule annexed hereto nor the furnishing or availability for review of any document will be construed to modify, qualify or disclose an exception to any representation or warranty of any Party made herein or in connection herewith, except to the extent that such representation or warranty specifically refers to such Schedule and such modification, qualification or exception is clearly described and apparent in such Schedule.

10.10 <u>Multiple Counterparts</u>. This Agreement may be executed in one or more counterparts (including by facsimile, pdf transmission or similar means of electronic transmission), each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

10.11 <u>Construction</u>. The provisions of this Agreement shall be construed according to their fair meaning and neither for nor against any Party irrespective of which Party caused such provisions to be drafted. Each of the Parties acknowledge that it has been represented by an attorney in connection with the preparation and execution of this Agreement.

10.12 <u>Time of the Essence</u>. Time is of the essence in respect of each and every term, covenant, or agreement included in this Agreement.

10.13 <u>Severability</u>. The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or part thereof, not essential to the commercial purpose of this Agreement, or the application thereof to any Person or any circumstance, is illegal, invalid or unenforceable, (i) a suitable and equitable provision shall be substituted therefor in order to consummate, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

10.14 <u>No Dissemination/Solicitation</u>. Unless the Buyer agrees otherwise, Seller will not disseminate this Agreement before the Sale Motion has been filed, and will not solicit higher or

better offers to this Agreement before the hearing on the approval of the Stalking Horse Protections at the Sale Motion.

## ARTICLE XI. - DEFINITIONS

Capitalized terms used in this Agreement are used as defined in this <u>Article XI</u> or elsewhere in this Agreement.

11.01   <u>Definitions</u>.

(a)   "<u>Accounts Receivable</u>" shall have the meaning set forth in <u>Section 1.01(a)(iii)</u> of this Agreement.

(b)   "<u>Affiliate</u>" shall mean, with respect to any Person, any other Person controlling, controlled by or under common control with such Person.  The term "Control" as used in the preceding sentence means, with respect to a corporation, the right to exercise, directly or indirectly, more than 50% of the voting rights attributable to the shares of the controlled corporation and, with respect to any Person other than a corporation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person.

(c)   "<u>Agreement</u>" shall have the meaning set forth in the preamble of this Agreement.

(d)   "<u>APF Name</u>" shall have the meaning set forth in <u>Section 8.04</u>.

(e)   "<u>Apportioned Obligations</u>" shall have the meaning set forth in <u>Section 10.01</u> of this Agreement.

(f)   "<u>Assigned Contracts</u>" shall have the meaning set forth in <u>Section 1.01(a)(i)</u> of this Agreement.

(g)   "<u>Assigned Leases</u>" shall be the leases listed on <u>Exhibit A</u> annexed hereto.

(h)   "<u>Assumed Obligations</u>" shall have the meaning set forth in <u>Section 1.01(d)</u> of this Agreement.

(i)   "<u>Bankruptcy Case</u>" shall have the meaning set forth in the recitals of this Agreement.

(j)   "<u>Bankruptcy Code</u>" shall have the meaning set forth in the preamble of this Agreement.

(k)   "<u>Bankruptcy Court</u>" shall have the meaning set forth in the recitals of this Agreement.

(l)    "Business" shall mean the business conducted by Seller as of the date hereof, consisting of the designing, manufacturing, and distribution of museum quality traditional and contemporary picture frames and framed mirrors.

(m)    "Business Day" shall mean any day other than (i) Saturday or Sunday or (ii) any other day on which banks in New York, New York are authorized or required to be closed.

(n)    "Buyer" shall have the meaning set forth in the preamble of this Agreement.

(o)    "Buyer Damages" shall have the meaning set forth in Section 9.02 of this Agreement.

(p)    "Buyer Indemnified Parties" shall have the meaning set forth in Section 9.02 of this Agreement.

(q)    "Cash Portion" shall have the meaning set forth in Section 1.02(a) of this Agreement.

(r)    "Closing" shall have the meaning set forth in Section 2.01 of this Agreement.

(s)    "Closing Date" shall have the meaning set forth in Section 2.01 of this Agreement.

(t)    "Collateral Agreements" shall mean any or all other agreements, instruments or documents required or expressly provided under this Agreement to be executed and delivered in connection with the transactions contemplated by this Agreement.

(u)    "Contracts" shall mean, when described as being those of or applicable to any Person, any and all written or oral contracts, agreements, franchises, understandings, commitments, arrangements, leases, licenses, registrations, authorizations, easements, servitudes, rights of way, mortgages, bonds, notes, guaranties, liens, or other instruments or undertakings to which such Person is a party or to which or by which such Person or the property of such Person is subject or bound, and (except with respect to pre-Closing Contracts of Buyer) relating in any manner to or associated with the Business or the Purchased Assets.

(v)    "Confidentiality Agreement" shall have the meaning set forth in Section 10.02 of this Agreement.

(w)    "Contract Determination Date" shall have the meaning set forth in Section 7.03(c).

(x)    "Conveyance Documents" shall have the meaning set forth in the Section 1.01(c) of this Agreement.

(y) "Employee Plan" shall mean all plans, practices and arrangements, written or unwritten, formal or informal, whether applicable to a group of individuals or a single individual, and whether active, frozen or terminated, providing compensation (other than salary or wages) or other benefits of any type or nature with respect to the employees of the Business, including, but not limited to, all plans providing benefits for such employees that are employee benefit plans as defined in Section 3(3) of ERISA.

(z) "Escrow Agreement" shall mean the escrow agreement, attached in form at Exhibit F hereto.

(aa) "Excluded Assets" shall have the meaning set forth in the Section 1.01(b) of this Agreement.

(bb) "Excluded Confidential Information" shall mean any information (including attorney-client communications) related to the Bankruptcy Case or any Liabilities not assumed by Buyer.

(cc) "Excluded Liabilities" shall have the meaning set forth in the Section 1.01(e) of this Agreement.

(dd) "Financial Statements" shall have the meaning set forth in Section 3.03 of this Agreement.

(ee) "GAAP" shall mean, at a given time, United States generally accepted accounting principles, consistently applied.

(ff) "Governmental Authorities" shall mean any nation or country (including, but not limited to, the United States) and any commonwealth, territory or possession thereof and any political subdivision of any of the foregoing, including, but not limited to, courts, departments, commissions, boards, bureaus, agencies, ministries or other instrumentalities.

(gg) "Hampshire" shall mean Hampshire Management Company, LLC.

(hh) "Hired Employees" shall mean all Selected Employees who accept (and commence) employment with Buyer.

(ii) "Intellectual Property" shall mean (a) all trademarks, service marks, trade names, trade dress, product names and slogans both registered and unregistered, and any common law rights and good will appurtenant thereto, and all applications and registrations thereof; (b) all copyrights in copyrightable works and all other ownership rights in any works of authorship, any derivations thereof and all moral rights appurtenant thereto and all applications and registrations thereof; (c) all registered, reserved and unregistered domain names, uniform resource locators and keywords; (d) all computer and electronic data, documentation and software, including both source and object code, computer and database applications and operating programs; (e) all rights relating to the use of any name, image or likeness of any Person or the portrayal of a Person, either individually or together with others; (f) all Trade Secrets and confidential business, technical and proprietary information, including ideas, research notes,

development notes, know-how, residuals, formulas, business methods and techniques, supplier lists, and marketing, financial and pricing data; (g) the right to sue both in equity and for past, present and future damages of any or all of the foregoing; (h) all existing copies and tangible embodiments of any or all of the foregoing, in whatever form or medium; (i) all right, title and interest (free and clear) in and to Seller's website(s), including without limitation, the framework and infrastructure of such web site(s), the layout design and the "look and feel" thereof, all related software, source code and object code, all CGI, HTML, XML or other coding, all scripts and applets, all web graphics and data, all navigational buttons, all server configurations, and any and all attendant intellectual property rights therein; (j) all customer data collected in the ordinary course of the Business; and (k) all other intellectual property rights relating to any or all of the foregoing including any renewals, continuations or extensions thereof; in each case as owned by Seller.

(jj)     "Intellectual Property License Rights" shall mean only the rights set forth on Schedule 10.01(oo) annexed hereto.

(kk)     "Inventory" shall mean all of Seller's inventory (including packaging, finished goods, raw material, supplies, works-in-process, and spare parts, and all inventory in transit or on order and not yet delivered and all rights with respect to the processing and completion of any works-in-process) to which such holds title that is used or held for use in the conduct of the Business.

(ll)     "IRC" shall have the meaning set forth in Section 1.03(a).

(mm)     "IRS" shall have the meaning set forth in Section 1.03(a).

(nn)     "Knowledge of Seller" shall mean the knowledge of Seller and any Person associated with Seller including, but not limited to, Max Munn.  For the purposes of this Agreement a Person will be deemed to have "knowledge" of a particular fact or other matter if (i) such individual is actually aware of such fact or other matter, or (ii) it is reasonable to expect that an individual might be aware of a fact or matter based on that individual's role and responsibilities a prudent individual could be expected to discover or otherwise become aware of such fact or other matter in the course of conducting a reasonably comprehensive investigation concerning the existence of such fact or other matter.

(oo)     "Leased Real Property" shall have the meaning set forth in Section 3.18 of this Agreement.

(pp)     "Legal Requirements" shall mean, when described as being applicable to any Person, any and all laws (statutory, judicial or otherwise), ordinances, regulations, judgments, orders, directives, injunctions, writs, decrees or awards of, and any Contracts with, any Governmental Authority, in each case as and to the extent applicable to such Person or such Person's business, operations or properties.

(qq)     "Liability" shall mean any debt, liability, commitment and guaranty, warranty or obligation of any kind, character or nature whatsoever, whether known or unknown,

secured or unsecured, accrued, fixed, absolute, potential, contingent or otherwise, and whether due or to become due.

(rr)    "Licensed Intellectual Property" shall have the meaning set forth in the Section 3.19(a) of this Agreement.

(ss)    "Liens" shall have the meaning set forth in the Section 1.01(a) of this Agreement.

(tt)    "Losses" shall mean, collectively, any actions, Liabilities, governmental orders, Liens, losses, damages, diminution of value, bonds, dues, assessments, fines, penalties, Taxes, fees, costs (including costs of investigation, defense and enforcement of this Agreement), expenses or amounts paid in settlement (in each case, including reasonable attorneys' and experts' fees and expenses), whether or not involving a third party claim.

(uu)    "Material Adverse Change" shall mean (a) with respect to Seller, (i) a change in (or effect on) the condition (financial or otherwise), properties, assets (including intangible assets), Liabilities (including contingent Liabilities), rights, obligations, operations, business or prospects, which change (or effect) is materially adverse to the financial condition, properties, assets, Liabilities, rights, obligations, operations, business or prospects of Seller taken as a whole; or (ii) a material adverse change in the ability of Seller to consummate the transactions contemplated by this Agreement and fulfill, in all material respects, all its obligations under this Agreement, and (b) with respect to Buyer, a material adverse change on its ability to consummate the transactions contemplated by this Agreement and fulfill, in all material respects, all of its obligations under this Agreement.

(vv)    "Ordinary Course of Business" means the operation of the Business by Seller in the usual and ordinary course in a manner substantially similar to the manner in which Seller operated, consistent with past practice prior to the date hereof, subject to any obligations or duties as a debtor under the Bankruptcy Code or any order of the Bankruptcy Court may require.

(ww)    "Owned Intellectual Property" shall have the meaning set forth in Section 3.19(b) of this Agreement.

(xx)    "Party" shall have the meaning set forth in preamble of this Agreement.

(yy)    "Permits" shall mean any and all permits, registrations, certificates, consents, rights, approvals, licenses, authorizations, legal status, orders or Contracts under any Legal Requirement or otherwise granted by any Governmental Authority.

(zz)    "Person" shall mean any individual, partnership, joint venture, firm, corporation, association, limited liability company, trust or other enterprise or any governmental or political subdivision or any agency, department or instrumentality thereof.

(aaa)    "Personnel Files" shall have the meaning set forth in Section 3.13 of this Agreement.

(bbb)    "Petition Date" shall have the meaning set forth in the recitals of this Agreement.

(ccc)    "Procedures Motion" shall have the meaning set forth in Section 7.01 of this Agreement.

(ddd)    "Procedures Order" shall have the meaning set forth in Section 7.01(a) of this Agreement.

(eee)    "Proceeding" shall have the meaning set forth in Section 3.09 of this Agreement.

(fff)    "Purchased Assets" shall have the meaning set forth in Section 1.01(a) of this Agreement.

(ggg)    "Purchased Equipment" shall have the meaning set forth in Section 1.01(a)(i) of this Agreement.

(hhh)    "Purchase Price" shall have the meaning set forth in Section 1.02 of this Agreement.

(iii)    "Records" shall have the meaning set forth in Section 1.01(a)(ix) of this Agreement.

(jjj)    "Sale Motion" shall have the meaning set forth in Section 7.01 of this Agreement.

(kkk)    "Sale Order" shall have the meaning set forth in Section 7.01(a) of this Agreement.

(lll)    "Selected Employees" shall have the meaning set forth in Section 5.04 of this Agreement.

(mmm)    "Selected Firm" shall have the meaning set forth in Section 1.03(e) of this Agreement.

(nnn)    "Seller" shall have the meaning set forth in the preamble of this Agreement.

(ooo)    "Straddle Period" shall mean any taxable period that begins before the Closing Date and ends after the Closing Date.

(ppp)    "Subsidiary" of any Person shall mean any Person of which a majority of the outstanding voting securities or other voting equity interests are owned, directly or indirectly, by such Person.

(qqq)    "Tax" or "Taxes" shall mean any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium,

windfall profits, environmental (including taxes under Internal Revenue Code §59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(rrr) "<u>Tax Return</u>" shall mean any returns, declaration, reports or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof and other returns and reports which were required to be filed in respect of all Taxes, levies, license, registration and permit fees, charges or withholding of any nature whatsoever.

(sss) "<u>Trade Secrets</u>" shall mean information of Seller, including, but not limited, to technical or non-technical data, formulas, patterns, compilations, programs, financial data, financial plans, product or service plans or lists of actual or potential customers or suppliers, which (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other Persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

(ttt) "<u>WARN</u>" shall have the meaning set forth in <u>Section 3.13</u> of this Agreement.

11.02 <u>Rules as to Usage</u>. Except as otherwise expressly provided herein, the following rules shall apply to the usage of terms in this Agreement:

(a) The terms defined above have the meanings set forth above for all purposes, and such meanings are equally applicable to both the singular and plural forms of the terms defined. If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).

(b) "Include," "includes" and "including" shall be deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import.

(c) "Writing," "written" and comparable terms refer to printing, typing, and other means of reproducing in a visible form.

(d) Any legal requirement defined or referred to herein means such legal requirement as from time to time amended, modified or supplemented, including by succession of comparable successor legal requirement and any rules and regulations promulgated thereunder.

(e) Reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity.

(f)     Reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof.

(g)     Any term defined above by reference to any agreement, instrument or Law has such meaning whether or not such agreement, instrument or Law is in effect.

(h)     "Hereof," "herein," "hereunder" and comparable terms refer, unless otherwise expressly indicated, to the entire agreement or instrument in which such terms are used and not to any particular article, section or other subdivision thereof or exhibit or schedule or other attachment thereto.   References in an instrument to "Article," "Section," or another subdivision or to an exhibit or schedule or other attachment are, unless the context otherwise requires, to an article, section, subsection or subdivision of or an exhibit or schedule or other attachment to such agreement or instrument.

(i)     Pronouns, whenever used in any agreement or instrument that is governed by this Agreement and of whatever gender, shall include all Persons.  References to any gender include, unless the context otherwise requires, references to all genders.

(j)     "Shall" and "will" have equal force and effect.

(k)     Whenever the consent or approval of any Party is required pursuant to this Agreement, unless expressly stated that such consent or approval is to be given in the sole discretion of such Party, such consent or approval shall not be unreasonably withheld, conditioned or delayed.

(l)     Whenever this Agreement refers to a number of days, months or years such number shall refer to calendar days, months or years unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

(m)     All calculations and computations pursuant to this Agreement shall be carried and rounded to the nearest two (2) decimal places.

(n)     References to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto.

(o)     All references herein to "$" or dollars shall refer to United States dollars.

(p)     References to specific named statutes and generally accepted accounting principles are intended to be and shall be construed as references to statutes of the United States of the stated name and United States generally accepted accounting principles, respectively, unless the context otherwise requires.

(q)     The term "commercially reasonable" shall mean, in addition to its general use and meaning, with respect to any matter involving litigation or disputes involving or requiring a ruling from the Bankruptcy Court, the preparation and filing of any motions or

papers, including supporting affidavits or declarations and any reply or objection papers as required or permitted, in a manner reasonably calculated to achieve the intended result.

[Remainder of page left intentionally blank.]

IN WITNESS WHEREOF, this Agreement has been signed by or on behalf of each of the Parties as of the day first above written.


BUYER:                         APF MANAGEMENT COMPANY, LLC


By:_____
    Name:  Gregory J. Petrillo
    Title:  Co-Managing Member


SELLER:                     APF GROUP, INC. d/b/a A.P.F. MASTER
FRAMEWORKERS a/k/a APF MUNN


By:*/s/*_____
    Name:  Max Munn
    Title:  President

**Exhibit A**

**Assigned Contracts**

**Exhibit B**

**Purchased Equipment**

**Exhibit C**

**Included Assets**

**Exhibit D**

**Excluded Assets**

**Exhibit E**

**Excluded Contracts**

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE |
| --- | --- |
| | |

**Exhibit F**

**Assumed Obligations**

The Buyer shall assume the current ordinary course obligations to the following vendors as of the Closing Date, up to the aggregate amount of $125,000; provided that: (i) such obligation has arisen in the ordinary course of the Seller's business not more than thirty (30) days before the Closing Date; (ii) the obligation has not yet become due; and (iii) the services rendered and/or goods provided by such vendor are identifiable and have been received by the Seller as of the Closing Date, or will be received by the Buyer after the Closing Date.

Vendor Name
AMERICAN BUSINESS SYSTEM, INC
AMERICAN MIRROR COMPANY
STEPHENSON B ANDREWS
BROWN & BROWN OF NEW YORK, INC
DGA SECURITY SYSTEMS, INC
DUGGAL VISUAL SOLUTIONS, INC.
DAVIE KAPLAN
LEAF
NEW PENN MOTOR EXPRESS
NIELSEN BUSINESS MEDIA, INC
OLD DOMINION FREIGHT LINE INC
PIEDMONT PLASTICS, INC.
PITNEY BOWES RESERVE ACCT
PITNEY BOWES
POLAND SPRING
PRECISION SAW & TOOL CORP.
RESICOM CUSTOM PAINTING
SUBURBAN CARTING CORP.
SUPERIOR VENEER & PLYWOOD

**Exhibit G**

**Bidding Procedures**

(1)  <u>Acquisition Approval Motion</u>.  Seller shall cause to be filed with the Bankruptcy Court and served upon all interested parties (and known interested prospective buyers) a motion (the "<u>Sale Motion</u>") in form and substance acceptable to Buyer seeking (on an expedited basis) an initial hearing for the approval of bid protections and bidding procedures in connection with, and further seeking the scheduling of a hearing (the "<u>Final Hearing</u>") for approval of, the Agreement and Collateral Agreements to be executed by and between Seller and Buyer.  The Sale Motion shall designate Buyer as the "<u>Stalking Horse</u>".

(2)  <u>Stalking Horse Provisions</u>.  If the Purchased Assets to be sold pursuant to the Agreement are sold other than to Buyer (or an affiliate of Buyer) in accordance with the procedures provided in the Sale Motion, then Seller's attorney shall return the Deposit to Buyer, together with all accrued interest, and Buyer shall be paid (i) the sum of eighty-five thousand dollars ($85,000) (the "<u>Break-Up Fee</u>") and (ii) Buyer's reasonable and necessary out-of-pocket fees and costs, including costs of counsel, in an amount not to exceed eighty-five thousand dollars ($85,000) (the "<u>Expense Reimbursement</u>", and together with the Break-Up Fee, collectively the "<u>Stalking Horse Protections</u>").  The Stalking Horse Protections shall be entitled to status and payment as a super-priority administrative expense in Seller's bankruptcy case.

(3)  <u>Access to Data Room</u>.  Seller will maintain an electronic data room that contains relevant information for evaluation by interested parties, including books and records, material contracts and other financial and operational information for due diligence investigation.  Seller will make this electronic data room available to any entity Seller determines to be qualified that executes an appropriate confidentiality agreement.  Interested parties, to the extent they may want to submit a Qualified Offer (as defined below), shall have until 3:00 p.m. Eastern Standard Time on February 23, 2011 to complete its due diligence.

(4)  <u>Offer Deadline</u>.  Binding offers to purchase the Purchased Assets to be sold under the Agreement ("<u>Qualified Offers</u>") may be submitted up to and until 5:00 p.m. Eastern Standard Time on February 23, 2011.  Each Qualified Offer must include (i) a mark up of the Agreement to the extent a Qualified Offer contemplates any changes thereto, (ii) detailed information about the party making the Qualified Offer, including its financial and other capacity to consummate the transaction, and (iii) information sufficient to demonstrate that the party making the Qualified Offer will be able to provide parties to assumed and assigned contracts and leases with adequate assurance of its ability to perform under them.

(5)  <u>Offer Evaluation Process</u>.  On February 24, 2011, a meeting (the "<u>Offer Evaluation Process</u>") will be held at the offices of counsel to Seller, if Seller

48

determines in its discretion, after consultation with its Creditors' Committee, that proceeding with the Offer Evaluation Process is appropriate. During the Offer Evaluation Process, Seller shall evaluate any Qualified Offers submitted during the Offer Evaluation Process, provided that (i) any initial Qualified Offer provides consideration for the Purchased Assets that exceeds the total consideration offered for such Purchased Assets by Buyer by an amount not less than two hundred thousand dollars ($200,000) and (ii) such initial Qualified Offer includes a minimum cash component of no less than two hundred thousand dollars ($200,000). Any successive Qualified Offers (in the event of an auction or similar process) shall be considered only if they exceed the previous offer by ten thousand dollars ($10,000) dollars and includes a minimum cash component of no less than two hundred thousand dollars ($200,000). In comparing offers during the Offer Evaluation Process, and to the extent the Stalking Horse Protections are approved by the Bankruptcy Court, the parties shall consider that selecting the offer of Buyer would avoid having to pay Buyer the Stalking Horse Protections. Seller may recess the Offer Evaluation Process from time to time in its discretion in order to assess Qualified Offers or permit participants to alter or increase their Qualified Offers. Seller may conduct the Offer Evaluation Process as an auction, a series of negotiations or by whatever other means it determines to be appropriate in its business judgment.

(6)     <u>Seller's Business Judgment</u>. Seller shall have the sole and absolute discretion, subject to approval of the Bankruptcy Court, to determine the relative value of any Qualified Offer, to determine whether to accept or reject any Qualified Offer, subject to Buyer's entitlement to the Stalking Horse Protections as set forth herein, and to determine which Qualified Offer it deems to be the highest and best offer available. Specifically, in evaluating competing Qualified Offers, Seller shall not be limited to price as the determinative factor, but may consider other factors, including, without limitation, the financial qualifications of the party or parties submitting the Qualified Offer(s) and the likelihood that the proposed acquisition transaction will close within a timeframe acceptable to Seller.

(7)     <u>Approval Hearing</u>. Upon the conclusion of the Offer Evaluation Process, Seller will file and serve a supplement to the Sale Motion identifying the highest and best offer, as determined in its business judgment, following the Offer Evaluation Process in consultation with its Creditors' Committee, and requesting at the Final Hearing the approval of the sale of the Purchased Assets pursuant to Sections 363 and 365 of the Bankruptcy Code to that party submitting such offer. Seller shall request at the Final Hearing that the Bankruptcy Court immediately enter an order approving the sale of the Purchased Assets to Buyer or, alternatively and if applicable, to the party having made a higher and better Qualified Offer.